IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 22-110-CFC |
| | : | |
| JORDAN HARMON, | : | |
| | : | |
| Defendant. | : | |

**JORDAN HARMON'S SENTENCING MEMORANDUM**[1]

**I.    INTRODUCTION**

Jordan Harmon, by and through undersigned counsel, hereby submits this Sentencing Memorandum in support of his sentencing hearing. Mr. Harmon accepts his personal culpability. He asks that the Court consider his personal circumstances and experiences that have brought him before the Court and impose a sentence consistent with the guideline range calculated by the U. S. Probation and Pretrial Services Office for the District of Delaware (Office of Probation). The guideline range of 12 months to 18 months, calculated by the Office of Probation, will satisfy

---

[1] As always, the defense has filed an Attachment A under seal for the court's review.

1

the sentencing factors set forth in 18 U.S.C. 3553(a) as they relate to Mr. Harmon. Presentence Investigation Report (PSR) at ¶ 112.

## II.    PERSONAL HISTORY AND BACKGROUND

Mr. Harmon is a mere 25 years old. Mr. Harmon is the younger of two children born to Mark Harmon and Crystal Harmon (maiden name Harris). PSR at ¶ 86. Mr. Harmon was born in the city of Dover, October 3, 1998. *Id.* He has one sister, Deja Harmon (27).  Deja lives in southern Delaware and works for Bayhealth Hospital in Milford. PSR at ¶ 87. Tragically, Mark Harmon passed away in February 2020, from cancer. Mark Harmon was only 48 at that time and Mr. Harmon was just 21. *Id.*

The family originally lived in Dover. Mr. Harmon's father worked in the nonprofit arena providing social services, while his mother worked as a nursing assistant and attended school.[2] When Mr. Harmon was about six years old the family moved to Wilmington. PSR at ¶ 88. His father had obtained a position with the Boys & Girls Club. This change was a positive one for the family.  However, the upward trend was not long lived. The family began to experience financial troubles and within a few years of the family's arrival in Wilmington, Mr. Harmon's parents separated. *Id.*

---

[2] Mr. Harmon's father later became a part-time pastor for a church in Dover.

Mr. Harmon's mother and sister moved back to Dover, while Mr. Harmon and his father remained in Wilmington. Even though he resided in Wilmington, Mr. Harmon and his sister both attended the Academy of Dover, a charter school. PSR at ¶ 89. Because Mr. Harmon was living in one area and attending school in another area, he had difficulty making friends. *Id.* In addition, Mr. Harmon's father was very focused on work. *Id.* This arrangement left Mr. Harmon isolated and longing to belong, a desire that he would carry with him into young adulthood.

In 2008, Mr. Harmon moved to Dover to live with his mother and sister. PSR at ¶ 90. During this time, Mr. Harmon's mother was working and still attending school. While the family was not destitute, they were in a tight economic situation. There was not always enough money each month to pay the bills. *Id*. The family had to adjust to going without from time to time.

Mr. Harmon's father moved back to Dover about a year later. After that, Mr. Harmon, like many children of divorced parents have done, alternated his living arrangements between his parents' households from fifth grade until the completion of eighth grade. Mr. Harmon then attended high school at Polytech. PSR at ¶ 100. There, Mr. Harmon studied engineering design technology, with hopes of attending college for architecture. He also participated on the basketball team. However, during these adolescent years, Mr. Harmon had difficulty finding himself and fitting

in. Unfortunately, this led Mr. Harmon to stop attending school in the eleventh grade. *Id.*

What had previously been a tenuous hold by Mr. Harmon on normalcy, completely escaped his grasp in March of 2020. That was when his father died shortly after a cancer diagnosis. Mr. Harmon and his father had a "unique" relationship. PSR at ¶ 89. Mr. Harmon was effusive about the life lessons his father sought to teach him and their value. *Id.* In contrast, Mr. Harmon lamented the lack of time they spent together during his childhood. With his father's death in 2020, the opportunity to grow and enhance their relationship was lost. It was then that Mr. Harmon lost himself and his behavior went over the edge.

Mr. Harmon had no convictions prior to May of 2020. In addition, his wayward conduct prior to this time was of much less significance. While Mr. Harmon had struggled previously, it was March 5, 2020, that broke him. Exhibit A Mr. Harmon purchased his first firearm in April.

One grounding force in Mr. Harmon's life has been his relationship with Ms. Janae Lewis. The two have been together for four years. Ms. Lewis has a daughter from a prior relationship that has become a part of Mr. Harmon's life as well. Prior to Mr. Harmon's arrest, he and Ms. Lewis resided together.

4

Mr. Harmon's reckoning and recovery began from the time he came into federal custody. Mr. Harmon has never served a prison sentence before. During his incarceration, Mr. Harmon has had to wrestle with his transgressions, the harm it has caused and the disappointment of his loved ones. Mr. Harmon now recognizes that his actions have only exacerbated the suffering his family experienced after the death of his father. This is especially true for his mother. He has also had to contemplate what the loss of his father has meant to him as well as how his father would feel about the turn his life has taken.

This time of introspection and reflection has resulted in Mr. Harmon moving to turn his life in a new direction. This course correction is not just a rejection of his recent and short-lived criminal conduct, but also a shift of the directionless approach to living that led him to drop out of school. While housed at the Federal Detention Center in Philadelphia, Mr. Harmon obtained his GED. Exhibit B. Mr. Harmon is committed to become the person his family knows he can be, and the person Ms. Lewis and her daughter need him to be.

### III. GUIDELINES

Mr. Harmon's PSR indicates his Criminal History Category is I and his total offense level is 13. PSR at ¶ 112. The corresponding advisory Guidelines range is 12 to 18 months. *Id*.

## IV. **DISCUSSION**

Mr. Harmon was lost, even prior to his father's death. After that tragedy, however, he began a self-destructive descent that ran counter to everything he was taught by his family. Mr. Harmon does not offer this as an excuse for his conduct, but only as an explanation as to why he is before the court in this manner. He is apologetic for his actions. It is worth noting, that Mr. Harmon turned 21 in October of 2019.[3] However, despite being eligible, he did not purchase a firearm until six months later. That purchase occurred one month after his father died.

The government urges the court to apply an upward variance of Mr. Harmon's sentence for ostensibly two reasons. First, the government urges a variance because two firearms purchased by Mr. Harmon were used in shootings and second, because the government alleges Mr. Harmon is a "gang" member. The government's arguments do not support a variance in the instant case.

Sentencing is governed by 18 U.S.C.A. § 3553. That statute declares "[e]xcept as provided in paragraph (2), the court shall impose a sentence of the kind, and within

---

[3] Mr. Harmon's age is also significant because of the well-recognized underdeveloped executive function present in the brains of young adults. *See Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham v. Fla.*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), as modified (July 6, 2010), and *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)).

the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission". The statute limits the authority of a court to vary from the sentencing range to those circumstances where the Sentencing Commission failed to account for an aspect of the case. That has not occurred here.

Departures and variances are different mechanisms by which courts can sentence a defendant outside of the calculated guideline range. *See* U.S.S.G. § 1B1.1 n.(F) and USSG §1B1.1, n. (backg'd.). Despite their subtle differences, courts have determined that the law governing departures has applicability to a court's decision whether or not to vary the calculated guideline range. *See United States v. Johnson*, 619 F.3d 910, 922 (8th Cir. 2010) (stating "[w]hile a district court is not bound by departure precedents when making variance decisions, it may still consider the departure precedents as persuasive authority"). Similarly, the United States Court of Appeals for the Eleventh Circuit decided that regardless of whether a court is applying a variance or a departure "similar principles come into play". *United States v. Howard*, 28 F.4th 180, 212 (11th Cir.), cert. denied sub nom. *Bramwell v. United States*, 143 S. Ct. 165, 214 L. Ed. 2d 56 (2022).

The government's argument that the Court should apply a variance because two of the firearms purchased by Mr. Harmon were used in crimes overlooks the case law. In *United States v. Bass*, the United States Court of Appeals for the Third Circuit stated that U.S.S.G. § 2K2.1 contemplated that transferred guns "would be used in future crimes". 54 F.3d 125, 130 (3d Cir. 1995). Because a variance cannot be applied unless the justification for it is not accounted for by the Sentencing Commission, the Third Circuit's ruling that the Sentencing Commission had accounted for the facts of this case forecloses the government's argument.

The government's second argument fails also. The government contends that because Mr. Harmon has a tattoo that is proof that he is a gang member.[4] The government further contends that Mr. Harmon's pose in a picture is proof that he belonged to a gang. The Defense maintains that even if the facts exist as alleged, they do demonstrate Mr. Harmon's membership in a gang, let alone his connection to any of the alleged instances in which firearms he purchased were used.[5] The government has provided no evidence that connects Mr. Harmon to the individuals it alleges used the firearms in question. More importantly, the government offers no evidence that Mr. Harmon knew or intended that the firearms in question would be

---

[4] The government has offered no definition of what a "gang" is.
[5] The Defense has not received ballistic evidence in this case.

8

used in the manner alleged. The government has not provided adequate grounds for a variance.

Because there are not adequate grounds for a variance the Court must sentence Mr. Harmon within the calculated guidelines.

## V.    CONCLUSION

Wherefore, for all of the above stated reasons, and any other reasons that this Court may find, Mr. Harmon respectfully requests a guideline sentence. Such a sentence is sufficient but not greater than what is necessary to achieve the goals of sentencing.

Respectfully submitted,

ELENI KOUSOULIS
Federal Public Defender

Dated: April 8, 2024          By:      /s/ David L. Pugh
                                       DAVID L. PUGH, ESQUIRE
                                       Office of the Federal Public Defender
                                       District of Delaware
                                       800 King Street, Suite 200
                                       Wilmington, DE  19801
                                       (302) 573-6010

                                       Attorney for Jordan Harmon