1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3    UNITED STATES OF AMERICA,        )
                                      )
4                                     )   No. 22-110-1-CFC
        v.                            )
5                                     )
     JORDAN HARMON,                   )
6                                     )
              Defendant.              )
7

8

9

10                  Monday, April 14, 2024
                         2:35 p.m.
11

12

13                      844 King Street
                     Wilmington, Delaware
14

15    BEFORE: THE HONORABLE COLM F. CONNOLLY
      United States District Court Judge
16

17

18    APPEARANCES:

19

20              UNITED STATES ATTORNEY'S OFFICE
                BY:  EDMOND FALGOWSKI, ESQ.
                        Counsel for the Government
21

22

23              FEDERAL PUBLIC DEFENDER
                BY:  DAVID PUGH, ESQ.
24                      Counsel for the Defendant

25

1                    _ _ _ _ _ _ _ _ _ _

2

3                    P R O C E E D I N G S

4

5        (Proceedings commenced in the courtroom beginning at

6    2:35 p.m.)

7                 **THE COURT:**  All right.  Good afternoon.  Please

8    be seated.

9                 Mr. Falgowski.

10                **MR. FALGOWSKI:**  Your Honor, this is the

11   sentencing of Jordan Donyell Harmon.  He's represented by

12   David Pugh.  There are objections, about four or five

13   pages of objections, at the back of the Presentence

14   Report.  I have Detective Robert Cunningham from the Dover

15   Police Department, the detective in this case, as a

16   witness in order to respond to those objections.

17                **THE COURT:**  Okay.

18                **MR. FALGOWSKI:**  And so that's where we are.

19                **THE COURT:**  All right.  Thank you.

20                Good afternoon, Mr. Pugh.

21                **MR. PUGH:**  Good afternoon, Your Honor.

22                **THE COURT:**  Mr. Harmon.

23                **THE DEFENDANT:**  Good afternoon.

24                **THE COURT:**  There's somebody else at your

25   table.

1          **MR. PUGH:**  Oh, pardon me, Your Honor.  This is

2     Andy Merrick.  He's from our office, Your Honor.

3          We do feel that it may be necessary to put up

4     some displays during the course of this hearing based off

5     of the testimony that the Government is alleging they're

6     going to elicit from the law enforcement officer.  Your

7     Honor, I don't know that that will be necessary, but

8     Mr. Merrick is here if that is needed.

9          **THE COURT:**  He's an IT person, I presume, then?

10         **MR. PUGH:**  Pardon me, Your Honor?

11         **THE COURT:**  He's an IT person, then?

12         **MR. PUGH:**  Yes.  Yes, Your Honor.  I apologize.

13         **THE COURT:**  Okay.  Great.  No problem.

14         All right.  Well, I reviewed, coming in to

15    today's hearing, the Government's sentencing memorandum,

16    and I've reviewed Mr. Harmon's sentencing memorandum.  I

17    reviewed the Attachment As, which are always filed under

18    seal in this district, and, of course, I reviewed the

19    presentence report.

20         Is there anything else I should have reviewed,

21    Mr. Falgowski?

22         **MR. FALGOWSKI:**  No.

23         **THE COURT:**  Mr. Pugh?

24         **MR. PUGH:**  Your Honor, I'm not sure if the

25    Court mentioned the letters that were included in my

1    client's --

2            **THE COURT:**  I thought they were attached to the

3    memo.

4            **MR. PUGH:**  Yes.

5            **THE COURT:**  Yes, I've read them.

6            **MR. PUGH:**  Just wanted to make sure the Court

7    did receive them.

8            **THE COURT:**  Yep.  Okay.  Thank you.

9            **MR. PUGH:**  Yes.

10            **THE COURT:**  All right.  And then, now, there

11    are some objections to the presentence report, so let's go

12    over those.

13            All right.  So the first objection is to what

14    are now Paragraphs 24, 25, and 27 of the most recently

15    readvised report.  And these are basically references to

16    West m8v3n and to West gr52vin, and whether or not those

17    constitute gang greetings, and then, also, the

18    reference -- well, the word "pole" being used to refer to

19    a "firearm."  And that "Left" refers to "Mr. Dixon."

20            All right.  Those are the objections, right?

21            **MR. PUGH:**  Your Honor, they were originally

22    objected to based off of my conversations with law

23    enforcement -- I mean, pardon me, with the Government.

24    Given what the law enforcement officer is expected to

25    testify to, I think we may be able to just accept those

1    and allow them in the PSR without objection.

2         THE COURT:  Okay.  So it's going to depend on

3    the testimony, though?

4         MR. PUGH:  Well, Your Honor, I think it might

5    be necessary to simply get a proffer as to what the law

6    enforcement is going to testify to, but it is entirely

7    possible, Your Honor, that we may be able to avoid that,

8    and, perhaps, Your Honor, a great deal of the testimony of

9    law enforcement, perhaps, entirely.

10        THE COURT:  How do you suggest we proceed,

11   then?  I mean, do you --

12        MR. PUGH:  Well, Your Honor, if the Court wants

13   to continue through all of them and then we get a proffer

14   from law enforcement as to what the testimony would be,

15   Your Honor, we could withdraw our objections.

16        THE COURT:  Okay.  Well, let's get a proffer,

17   then, on the first -- in this first set of objections.  I

18   mean, I kind of think it's in -- it's in the presentence

19   report.  Isn't it in the response from the presentence

20   officer?

21        MR. PUGH:  It is, Your Honor.  And I apologize

22   if I was unclear.  It's not so much a proffer to this, but

23   sort of a proffer to everything that the law enforcement

24   is going to testify to.  Because if all he's testifying to

25   is to the specific things that we objected that the

1    Government responded that they would have him testify to,

2    I think we're going to be okay.  The only question would

3    be if he's going to testify to things other than what

4    we've made objections to.

5            So, for instance, with respect to the first two

6    things here, Your Honor, if he's going to testify to those

7    things that -- that his knowledge is that those things

8    have been used in the manner that they're alleged, then we

9    would not object to that, Your Honor, because that's all

10   they are saying, is that -- so he's heard those things

11   used in a particular capacity in the past.  And if that's

12   the case, Your Honor, then we don't object.

13           **THE COURT:**  Oh, okay.  Well, all right.  Let's

14   deal with that then.

15           Mr. Falgowski, what do you want to do about the

16   first?

17           **MR. FALGOWSKI:**  We had a telephone conversation

18   and Mr. Pugh said, "Well, what's he going to testify to?"

19   And I said, "Well, he's -- among the things, he's going to

20   testify to the 'Left'" -- L-E-F-T.  "The Left is Dixon."

21           And he said, "Well, we can't agree to that."

22   And he said -- I said, "Well, there we are."

23           What he's going to testify to, the West move

24   in?  I mean, the detective would give some -- explain why

25   those are gang greetings, and that if you're not a gang

1    member, you're not going to use those greetings because

2    there is recourse.

3            The other thing that the agent is going to

4    testify to is that -- the problem that gangs generally

5    pose to Dover.

6            For instance, the agent is going to testify

7    he's qualified as an expert in gang, Dover gangs, in

8    Superior Court.  He has a two-page affidavit, which he

9    detailed his experience and training and his history

10   with -- and so I was going to offer -- I told Mr. Pugh --

11   I shared it with him when I got it, and I was going to

12   offer it into evidence as his qualifications, and just

13   kind of highlight a little bit of it --

14           **THE COURT:**  All right.

15           **MR. FALGOWSKI:**  -- before he gets into that.

16           But among the things he's going to testify to

17   was that that wiretap of Coleman and Dixon that opened

18   this investigation, he was the affiant.

19           And he's going to explain that they went on,

20   maybe, six different phones, all identified gang members

21   at the time because the gangs were such a problem.  So

22   many shootings, so many homicides in Dover, that that's

23   why they went up on that.

24           **THE COURT:**  So is he going to testify based on

25   that, that Left he knows from the conversations --

1      **MR. FALGOWSKI:**  He's going to say he's spoke to

2      at least four different people that, you know -- that they

3      said "Left."  And he has shown -- he's shown them

4      photographs, mugshots, and he said, "Yeah, that's Left."

5              **THE COURT:**  Oh, you have four IDs, then.  Okay.

6              **MR. FALGOWSKI:**  It's Dixon.

7              **THE COURT:**  And then what about the handicap

8      symbol?

9              **MR. FALGOWSKI:**  The handicap symbol.  He's been

10     in phones.  He goes on social media.  He looks at

11     Instagrams.  And it's a -- that handicap signal is a thing

12     that he sees, that people will throw into the -- into

13     their messages back and forth.  People that they've

14     identified as gang members, as Crips, and they use that.

15             He's also going to testify to those photographs

16     that I offered into evidence at the detention hearing.

17             **THE COURT:**  Right.

18             **MR. FALGOWSKI:**  And he's going to say, Well,

19     this specific -- this specific --

20             **THE COURT:**  Just the revocation of his

21     detention.

22             **MR. FALGOWSKI:**  Detention hearing.

23             **THE COURT:**  Well, okay.

24             **MR. FALGOWSKI:**  It was -- the judge detained.

25     The defense -- at the hearing, the defense asked the Court

1    to --

2            THE COURT:  -- revoke the detention.

3            MR. FALGOWSKI:  -- revisit it.

4            THE COURT:  Okay.

5            MR. FALGOWSKI:  And so I offered into evidence

6    at that time.

7            THE COURT:  Yep.  I've got those photographs.

8            MR. FALGOWSKI:  I believe at the original

9    hearing, the detention hearing, offered those photographs

10   in, but I attached them to my memo in support of that

11   hearing.

12           THE COURT:  Right.

13           MR. FALGOWSKI:  And he's going to testify, he

14   says, I think there's four photographs.  And he's going to

15   say that in one hand, he's making a "W" sign because it's

16   West Side.

17           THE COURT:  Right.  That's this photograph

18   here.

19           MR. FALGOWSKI:  And then the other is "C" for

20   "Crip."

21           THE COURT:  This photograph right here, right?

22           MR. FALGOWSKI:  Right.  In one hand where he's

23   making a "C," he says, "That's Crip."  And the other one

24   is West Side gang.  And they call themselves "WSG,"

25   West Side Gang.

1      And he's going to testify that in addition to

2   these signal -- these gang greetings that Dixon and the

3   defendant were sharing in this text message that was on

4   the phone, he's going to say that -- the officer would say

5   that when he spoke to the defendant's sister.  And the

6   defendant's sister said that Dixon, Roderick Dixon, was

7   her boyfriend.  And she said, "He's a crip."  She didn't

8   say her brother was.  But she said, "He's a crip."

9      You know, so it just goes to further identify

10  that one is a Crip.

11      **THE COURT:**  All right.  Anything else?  Well,

12  why don't we go from there.  Let's just -- now let's see

13  what we've got.  Let me hear from Mr. Pugh.

14      **MR. PUGH:**  Thank you, Your Honor.  Your Honor,

15  just very quickly.  I think there was some confusion in

16  our conversation earlier with respect to the --

17      **THE COURT:**  Let's do this.  Don't worry about

18  your prior conversations.  Let's go forward here.  You've

19  got objections to Paragraphs 24, 25, and 27.  So 24 and 25

20  are references to the West m8v3n and West gr52vin, whether

21  they're gang greetings.

22      Do you dispute that?

23      **MR. PUGH:**  No, Your Honor.

24      **THE COURT:**  All right.

25      **MR. PUGH:**  Well, we do not dispute that the

1    officer has seen those in the past as gang greetings.

2              **THE COURT:**  You know what, let's just have the

3    officer testify, and I'm just going to make findings of

4    fact.  I mean, if you've got other evidence you want to

5    counter what the Government says, so be it.  All right?

6    Let's just do that.

7              **MR. PUGH:**  Very well, Your Honor.

8              **THE COURT:**  All right.  So Mr. Falgowski, what

9    I'd say to you is -- now, not all these objections are

10   going to be covered by the testimony of this person.

11             So there's some other objections, I think,

12   that, perhaps, do not implicate the testimony, right?

13   They're more like legal objections, almost; is that right?

14   Like the shootings.

15             Is that a legal objection or, no, same thing?

16             **MR. PUGH:**  Pardon me?

17             **THE COURT:**  So you've got the number of

18   firearms.

19             **MR. PUGH:**  Your Honor --

20             **THE COURT:**  That's a fact based.

21             **MR. PUGH:**  -- we withdraw that objection.

22             **THE COURT:**  You're withdrawing the objection.

23             **MR. PUGH:**  Yes, Your Honor.

24             **THE COURT:**  Okay.  So the number of firearms is

25   withdrawn.  That was Paragraph 46.

1         All right.  Then we've got the adult criminal

2    conviction, Paragraph 71 and Paragraph 72.

3              **MR. PUGH:**  Your Honor, given the revised PSR

4    that treats that as the civil violation it is, Your Honor,

5    we -- the objection is moot at this point.

6              As far as the inclusion of it, Your Honor, we

7    withdraw that, as far as the mention of it within the PSR

8    point.

9              **THE COURT:**  All right.  He's still a Criminal

10   History Category I.

11             **MR. PUGH:**  Correct, Your Honor.

12             **THE COURT:**  Right.  Okay.  So that's withdrawn.

13             Then we've got Paragraph 65, Criminal History

14   Computation.  Same thing?

15             **MR. PUGH:**  Pardon me, Your Honor.

16             **THE COURT:**  Right?  Because it was revised.  So

17   I think it's --

18             **MR. PUGH:**  That is correct, Your Honor.

19             **THE COURT:**  All right.  So that's gone.

20             Then we've got Paragraph 66, Other Criminal

21   Conduct.

22             **MR. PUGH:**  Your Honor, we withdraw the request

23   to remove those facts.

24             **THE COURT:**  All right.  Then we've got the

25   handicap signal, sorry, handicap symbol dispute.  That's

1    going to be addressed in the testimony.  That's now

2    Paragraph 93.  So that still exists.

3              Then we've got Paragraph 111.

4         **MR. PUGH:**  Your Honor, we withdraw that

5    objection as well.

6         **THE COURT:**  All right.  So then I think it's

7    the case that the only objections that remain outstanding

8    are to Paragraphs 24, 25, and 27, and Paragraph 93; is

9    that accurate?

10        **MR. PUGH:**  That would be correct, Your Honor.

11        **THE COURT:**  Okay.

12        **MR. FALGOWSKI:**  Did Your Honor just say that

13   24, 25, and 27 are resolved or is --

14        **THE COURT:**  No.  That you're going to bring up

15   testimony on 24, 25, and 27.  The number of firearms,

16   apparently, is no longer disputed, so we're good on that.

17   And then the handicap symbol.  Okay?

18        **MR. FALGOWSKI:**  Yes.

19        **MR. PUGH:**  So, Your Honor, with respect to the

20   testimony of the officer, the Government is putting him

21   forth as an expert.  We would object to that

22   classification and ask for the opportunity to voir dire

23   him as to his credentials.

24        **THE COURT:**  And you can do that.  That's fine.

25        **MR. PUGH:**  Very well, Your Honor.

 1          **THE COURT:**  I'm not going to voir dire separate

 2     from the expert testimony.  Let's just save time.

 3          So go ahead, Mr. Falgowski, you can put the

 4     expert on, or the proposed expert on the stand.

 5          **MR. FALGOWSKI:**  The United States calls

 6     Detective Robert Cunningham, Dover Police Department.

 7          **THE COURT:**  All right.

 8          **THE CLERK:**  Please state and spell your name

 9     for the record.

10          **THE WITNESS:**  Robert Cunningham, R-O-B-E-R-T.

11     Cunningham, C-U-N-N-I-N-G-H-A-M.

12        ROBERT CUNNINGHAM, having been called as a witness,

13     being first duly sworn under oath or affirmed, testified

14     as follows:

15          **THE CLERK:**  Thank you.  You may be seated.

16                    DIRECT EXAMINATION

17     **BY MR. FALGOWSKI:**

18     **Q.**   Detective Cunningham, how long have you been a Dover

19     Police officer?

20     **A.**   I got hired by the Dover Police Department in

21     October 2013.

22     **Q.**   2013.

23          And what is your current position?

24     **A.**   My current position is the section leader for the

25     Drugs, Vice, and Organized Crime Unit -- sorry -- of the

*Cunningham - Direct*

1   Dover Police Department.

2   **Q.**   And does your current title have anything to do with

3   responsibility for gang investigations?

4   **A.**   Yes.  I'm also the Dover Police Department gang

5   intelligence coordinator.  Sorry.

6   **Q.**   Becoming the gang intelligence coordinator, how long

7   have you served that role?

8   **A.**   I became the gang intelligence coordinator, I

9   believe, in -- close to 2020.  Before that, I was a gang

10  intelligence officer.

11  **Q.**   And what's the difference between a gang intelligence

12  officer and coordinator?

13  **A.**   Coordinator oversees the officers.

14  **Q.**   How many officers do you now oversee?

15  **A.**   There's approximately ten at the Dover Police

16  Department.

17  **Q.**   All right.  And as a coordinator, do you have any

18  meetings with coordinators -- gang coordinators from other

19  law enforcement agencies?

20  **A.**   Yes.  Bimonthly there's a gang investigator meeting

21  throughout the state of Delaware.  But we hold roundtable

22  meetings for approximately an hour.

23  **Q.**   That's every two months?

24  **A.**   It's every two months.

25  **Q.**   And there would be some 30 other law enforcement

*Cunningham – Direct*

1   agencies represented?

2   **A.**   Approximately, yes.

3   **Q.**   And what happens at those meetings?

4   **A.**   It's discussion of new gang trends, current

5   intelligence, recent violent –– crime gang violence, and

6   identified gang members.

7   **Q.**   All right.  Have you attended, in 2022, any

8   Mid–Atlantic Regional Gang investigations or meetings?

9   **A.**   I did.

10  **Q.**   Tell us about that.

11  **A.**   So every year the Mid–Atlantic Regional Gang

12  Investigators Network has an annual conference.  And,

13  also, every year there is an East Coast Gang Investigators

14  conference, and I've attended multiple of those.

15  **Q.**   And what years did you attend the East Coast Gang

16  Investigators conference?

17  **A.**   2018, 2019, 2020, '21, '22, and '23?

18  **Q.**   How long are those conferences?

19  **A.**   A week long.  Approximately four days.

20  **Q.**   What's the subject of those?

21  **A.**   It's multiple subjects.  From motorcycle gangs, some

22  new gang trends, to identification of hybrid gangs; how to

23  identify gang members, new trends, new tattoos.

24  Multiple –– multiple topics.

25  **Q.**   And in the course of your experience, how many

*Cunningham – Direct*

1    gang-related investigations have you investigated?

2    **A.**    Over 200, at least.

3    **Q.**    And in the course of those investigations, have you

4    talked to the defendants charged in those investigations?

5    **A.**    Yes.

6    **Q.**    Any of them self-admitted gang members?

7    **A.**    Yes.

8    **Q.**    And there is a wiretap reference in the presentence

9    report.  And you prepared a criminal complaint in this

10    case.  So that's what got the criminal charges started,

11    right?

12    **A.**    Correct.

13    **Q.**    And you referenced that there was a Title III State

14    wiretap of a Devon Coleman; is that right?

15    **A.**    Yes.

16    **Q.**    Who was the affiant to that wiretap?

17    **A.**    I was.

18    **Q.**    You were.

19        And how many different phones did your investigation

20    go down on in addition to Derrick Coleman [Sic]?

21    **A.**    Approximately six, give or take.  Or more than --

22    about six, approximately.

23    **Q.**    And what precipitated that wiretap investigation?

24    **A.**    2019 into 2020, there was a spike --

25                **MR. PUGH:**  Your Honor, we would object.  We're

*Cunningham – Direct*

1    not challenging the existence of the wiretaps or that

2    there was a reason for the wiretaps.  If he says there

3    were wiretaps, we will assume that they were issued

4    appropriately in the case involving the gentleman that was

5    being investigated.

6         **THE COURT:**  Overruled.

7         **MR. PUGH:**  This goes -- this goes --

8         **THE COURT:**  Overruled.  Go ahead.

9         **MR. PUGH:**  Yeah.

10        **THE WITNESS:**  There was a spike in gang

11   violence consisting of shootings and homicides, beginning

12   from 2019 to 2020.

13   **BY MR. FALGOWSKI:**

14   **Q.**   Does that include Dover?

15   **A.**   Yes.

16   **Q.**   The other targets, were they in Delaware?

17   **A.**   Yes.

18   **Q.**   Were all the phones in Dover?

19   **A.**   Yes.  For the majority, yes -- no.  Excluding one.

20   **Q.**   All right.  And you said there was a spike in gang

21   violence that precipitated this wiretap; is that what you

22   said?

23   **A.**   That's correct.

24   **Q.**   Since that time, what's happened in Dover?

25   **A.**   Dover has slowed down in gang violence based on a lot

*Cunningham – Direct*

1   of people getting arrested based on the wiretap.  But

2   there are shootings here and there, but homicides have

3   gone down.

4   **Q.**   All right.  The -- in your affidavit for the criminal

5   complaint, you wrote a paragraph relating to these gang

6   greetings; is that correct?

7   **A.**   That's correct.

8   **Q.**   And the West m8v3n and -- can you tell us about, what

9   do those mean?  What is the West?  And what is the

10  gr52vin?  What's all that about?

11  **A.**   Yep.  So in Dover consists -- within Dover, there's

12  primary three Crip sets who all fall under the West Side

13  gang.  And of those Crip sets, one is Eight Tray, which is

14  eight-three gangster crips.  They use greetings as

15  "moving."  It's a known gang greeting and term used within

16  the gang.

17      Another one of those gangs of the three are Five Duce

18  Hoover Gangster Crips.  And they are commonly known to use

19  "grooving" within the gang.

20      Both of these gangs are allies.  They intertwined

21  with each other.  So it's consistent.  And through my

22  experience, I've seen many members of these gangs greet

23  each other from "moving" and "grooving," showing the

24  alliance.

25  **Q.**   Fifty-two Hoover, where does that come from?

*Cunningham — Direct*

1    **A.**    It originated in California on 52nd Street.

2    **Q.**    52nd Street?

3    **A.**    Hoover Street, I believe, yeah.

4    **Q.**    Hoover.

5            So Hoover is a street in Los Angeles?

6    **A.**    Yes.

7    **Q.**    And 52 is like another address or another location?

8    **A.**    52nd Street, I believe.

9    **Q.**    And so that's the original -- that's where that

10   originated, that's why it's 52 Hoover?

11   **A.**    Yes.

12   **Q.**    And then, what about the other one, West -- or what

13   is it?

14   **A.**    Eight Trey Gangster Crip.

15   **Q.**    Yeah, Eight Trey.  That's -- that would be

16   eight-three, correct?

17   **A.**    Yes.

18   **Q.**    The same thing?

19   **A.**    Same.  In California, yep.

20   **Q.**    All right.  And in the -- you said that in Dover,

21   there's three sets of Crips.  They all come under the

22   banner of what?  West?

23   **A.**    Yes.

24   **Q.**    Why west?

25   **A.**    That is the side of town that they operate in.

*Cunningham – Direct*

1   **Q.**   All right.  And what about east, does East have its

2   own set of gangs?

3   **A.**   Yes, predominantly.  We have East Side.  We have

4   several hybrid gangs on the east side, and mostly Blood

5   sets.

6   **Q.**   What's a hybrid set?

7   **A.**   So hybrid gang is a gang that originated from a

8   neighborhood that then grows and gets hierarchy and

9   commonly uses a national named gang for their set, like

10  set by murder or Mob Piru.

11  **Q.**   What was that last one?

12  **A.**   Mob Piru.

13  **Q.**   What's that mean?

14  **A.**   It's a Blood set.

15  **Q.**   M Piru?

16  **A.**   M-O-B Piru, Mob Piru.

17  **Q.**   What's that stand for?

18  **A.**   They sometimes say "Money over Bitches," Mob --

19  **Q.**   Okay.

20  **A.**   -- and Piru.

21  **Q.**   All right.  And have you seen these specific

22  greetings other than in this text message that you found

23  on the defendant's phone?

24  **A.**   Yes.

25  **Q.**   Where have you seen them?

*Cunningham - Direct*

1    **A.**    Through previous Crip investigations throughout

2    Dover.  There would be other phones that we've downloaded

3    where they've greeted each other "Moving and grooving."

4    And, also, throughout social media, they'd be posting

5    "Moving and grooving."

6    **Q.**    Approximately, how many times do you think you've

7    seen these types of greetings, this Hoover and --

8    **A.**    Several.  I can't put a number to it, but it's

9    several times.

10    **Q.**    All right.  And my understanding is that you once

11    spoke with the defendant's sister; is that correct?

12    **A.**    I have, yes.

13    **Q.**    Yeah.  And what, if anything, does she say about

14    Roderick Dixon?

15    **A.**    She identified him as a Crip member.

16    **Q.**    So he's using a Crip greeting in this text message,

17    and she identified him as a Crip?

18    **A.**    That's correct.

19    **Q.**    How many Hoover, 52 Hoover, gang members were there

20    when you began your wiretap investigation in 2020?

21    **A.**    I'd say, give or take, ten -- ten or 12 members.

22    **Q.**    What about today?

23    **A.**    About the same.  They come and go.

24    **Q.**    You also put in your affidavit for the criminal

25    complaint, you indicated that you found a text message on

1    the defendant's phone that would have been to the

2    defendant's known girlfriend.  And in there, he said that

3    Left wanted him to −− I'm paraphrasing −− "Left wanted me

4    to buy him a pole," P−O−L−E.

5         Can you tell us about that?

6    **A.**   Well, "Left" is an alias of Roderick Dixon.

7    **Q.**   How do you know that?

8    **A.**   Received information from confidential informants who

9    actually positively identified Roderick Dixon as "Left,"

10   by showing them mugshot photographs.  And through

11   multiple, multiple firearm investigations, through text

12   message, through social media, to informants, "pole" is a

13   known term used for "firearm."

14   **Q.**   All right.  And you showed photographs to people who

15   identified "Left" as being "Roderick Dixon"?

16   **A.**   That's correct.

17   **Q.**   The handicap picture.  You interviewed the defendant

18   for approximately two hours when he was arrested on the

19   state charge, correct?

20   **A.**   That's correct.

21   **Q.**   And at one point, it's fair to say you said, "Let me

22   see your arms"?

23   **A.**   Yes.

24   **Q.**   And you looked at his tattoos, correct?

25   **A.**   Yes.

*Cunningham - Direct*

1    **Q.**    And then one of pictures that was offered into

2    evidence at the detention hearing, at the revocation

3    response, was a picture of the defendant's arm with a --

4    the handicap signal; is that correct?

5    **A.**    That's correct.

6    **Q.**    All right.  And you indicated that that was a -- what

7    kind of a -- how did you categorize that tattoo?

8    **A.**    As a Crip logo.  A logo known used by Crip members.

9    **Q.**    And why do you say that?

10    **A.**    Through investigations, I've seen multiple times of

11    Crip members using the handicap logo.

12    **Q.**    How do they use it?

13    **A.**    Either, they tag their graffiti to it; used the emoji

14    logos through their social media accounts.  I've seen it

15    written on whiteboards, along with Dover West Side and

16    Crip lingo on it.

17    **Q.**    Why that emoji?  Why that handicap signal?

18    **A.**    Crip, cripple.

19    **Q.**    Do you know that or are you --

20    **A.**    It signifies Crips for a cripple, for the handicap.

21    A handicap's Crip, cripple, so ...

22    **Q.**    Where does that come from?

23    **A.**    I'm not sure where -- where they came up with it.

24    But it's ...

25    **Q.**    All right.

 1          **MR. FALGOWSKI:**  For the record, Your Honor,

 2   among those exhibits I offered into evidence at the

 3   detention hearing, the last two pages were from the

 4   Internet.  And I --

 5          **MR. PUGH:**  Your Honor, Mr. Falgowski, at this

 6   point, would be testifying.

 7          **THE COURT:**  He's not testifying.  He's

 8   explaining exhibits.  The exhibits, just for instance,

 9   let's be very clear, have already been -- they're part of

10   this record.  Hearsay is admissible.  The exhibits are

11   found at 20-3.

12          **MR. PUGH:**  Your Honor, withdraw the objection.

13          **THE COURT:**  I mean, you know, we're talking

14   preponderance of the evidence here.  We're not talking

15   reasonable doubt.  And, I mean, you're free to argue,

16   Mr. Pugh, about the probative value of the exhibits.

17          But anyway, go ahead.  Mr. Falgowski, do you

18   want to just finish what you're saying about those

19   exhibits.

20          **MR. FALGOWSKI:**  When I offered these into

21   evidence, I explained to the magistrate judge, I said,

22   "Look, I went online.  I did this.  I went online and I

23   punched in a couple of words in order to find out what was

24   the connection between this handicap emoji and Crips, and

25   this was what printed out on my computer screen."  And so

1    I printed out the pages, and that's it.

2              So this is what the Internet represents --

3              **THE COURT:**  Right.

4              **MR. FALGOWSKI:**  -- and so I didn't offer it

5    into evidence for any purpose other than that.

6              **THE COURT:**  All right.  And then just so I can

7    have that same document, what's labeled Exhibit C.  It's

8    20-1, Page 2.  It's this.

9              I just want to make sure, that's what you're

10   saying is the defendant's arm?

11             **MR. FALGOWSKI:**  Yes, Your Honor.

12             **THE COURT:**  Okay.

13             And that, you recognize that, Detective?

14             **THE WITNESS:**  Yes, Your Honor.

15             **THE COURT:**  Okay.

16             All right.

17             **MR. FALGOWSKI:**  Your Honor, may I approach the

18   witness, show him what I've got here?

19             **THE COURT:**  Yeah, sure.

20   **BY MR. FALGOWSKI:**

21   **Q.**   All right.  So at the detention hearing, we offered

22   into evidence some pages from the -- from that hearing.

23        And Exhibit A is the list of the 19 guns in question;

24   is that correct?

25   **A.**   Yes.

*Cunningham – Direct*

1    **Q.**    You actually typed that, right?

2    **A.**    Yes.

3    **Q.**    All right.  And then I offered into evidence B.

4    These were photographs.  So four photographs that I --

5    you, rather, forwarded to me; is that correct?

6    **A.**    Yes.

7    **Q.**    All right.  And the first one where there's a -- I

8    know this is an awful dark copy, but you were looking at

9    one of the originals.

10    Where did you get that photograph?

11    **A.**    Mr. Harmon's Facebook photo -- Facebook page, I

12    believe.

13    **Q.**    All right.  And the color of that shirt, looks like

14    it is red in this, but, in fact, it's orange; is that

15    right?

16    **A.**    That's correct.

17    **Q.**    All right.  And were you able to identify the person

18    depicted in the photograph as being the defendant?

19    **A.**    Yes.

20    **Q.**    And what's in his right hand?  What's he doing with

21    his right hand?

22    **A.**    I believe he has a circle with three fingers --

23    **Q.**    What is that?

24    **A.**    -- in his right hand.

25    I'm not 100 percent sure on that logo.  But the one

*Cunningham – Direct*

1    in his left hand is West Side with a "C," which is West

2    Side Crip.

3                **THE WITNESS:**  Like this, Your Honor.  West Side

4    Crip.  It's a "W" with a "C."

5                **THE COURT:**  Oh, okay.  I see it.  Thank you.

6    **BY MR. FALGOWSKI:**

7    **Q.**   All right.  And then the next photograph is someone

8    with a Detroit Tigers hat, leaning against the back of a

9    car.

10        What about that one?

11   **A.**   Hard to see, but I believe he's holding up a "W" for

12   "West Side."  I can't 100 percent tell based on the

13   quality of the photo.

14   **Q.**   All right.  And then the next photograph is a

15   photograph with a -- like a tan-colored hoodie.  The

16   defendant -- is that the defendant in this photograph?

17   **A.**   It is.

18   **Q.**   And the previous photograph, was that also the

19   defendant?

20   **A.**   Yes.

21   **Q.**   And this photograph here, what's he doing with his

22   right hand?

23   **A.**   He's holding up a "C" with his -- which signifies

24   Crip.

25   **Q.**   "C" is for "Crip"?

*Cunningham – Direct*

1   **A.**   Yes.

2   **Q.**   You've identified that as --

3   **A.**   Oh, yes.

4   **Q.**   -- as a -- so you've seen it before?

5   **A.**   Yes.

6   **Q.**   How often have you seen that depicted in social media

7   and --

8   **A.**   Multiple -- many times.

9   **Q.**   All right.  And then what about the fourth

10  photograph?  Is that the defendant squatting down on

11  haunches on the right-hand side of this photograph?

12  **A.**   It is.  And he is holding a "C" in his right hand and

13  a "West Side" on his left.

14  **Q.**   All right.  Now, the next one under Exhibit C, the

15  first photograph, that's the wheelchair insignia.  That's

16  on the defendant's arm; is that correct?

17  **A.**   That is a handicap logo, yes.

18  **Q.**   You took that photograph?

19  **A.**   Yes.

20  **Q.**   And then the next photograph shows the person with a

21  blue bandanna across their mouth and a signal in the

22  top-left portion of the photograph.

23      Can you tell me about that?

24  **A.**   That was just an example photo that I sent to you to

25  signify that Crip members do use the handicap logo to

1    identify a Crip.

2    **Q.**    Now, the person in this photograph, that's not the

3    defendant?

4    **A.**    I have no idea who that person is.

5    **Q.**    All right.  You sent it to me -- you copied me with

6    it because of the handicap emblem in the picture, correct?

7    **A.**    Sure, yeah.

8    **Q.**    What's the significance of blue?

9    **A.**    So blue is the primary color for Crips.  And

10    bandannas are used to represent as the Crip for, like, the

11    flag.  That's how they represent them.

12    **Q.**    And the emoji, that's also in blue, correct?

13    **A.**    Yes.

14    **Q.**    You -- have you previously qualified -- I don't know

15    if I've asked you or not -- have you previously qualified

16    in any courts in Delaware as an expert in Delaware gangs?

17    **A.**    Yes.

18    **Q.**    Which court?

19    **A.**    Kent County Superior Court.

20    **Q.**    And what was that in relation to?

21    **A.**    It was an amenability hearing for a gang member who

22    committed a shooting.

23    **Q.**    An amenability hearing, do you know what that is?

24    **A.**    Yes.  It's to see if a person will be either tried as

25    an adult or a juvenile.

1  **Q.**   So it's a juvenile who's charged with an offense, in

2  this case, a shooting.  And there was a hearing in

3  Superior Court to determine whether or not the juvenile

4  would remain in Family Court --

5  **A.**   It was --

6  **Q.**   -- because of the nature of the charge would be tried

7  in Superior Court?

8  **A.**   I believe he was being tried in Superior Court, and

9  they were trying to get him to be tried in juvenile.

10  **Q.**   All right.  So --

11  **A.**   The defense was arguing to be juvenile -- in Family

12  Court.

13  **Q.**   All right.  You prepared an affidavit in support of

14  your testimony in that case; is that correct?

15  **A.**   Yes.  Yes.

16  **Q.**   And is it fair to say that you forwarded me that

17  affidavit?

18  **A.**   Yes.

19  **Q.**   A two-page affidavit?

20  **A.**   Yes.

21         **MR. FALGOWSKI:**   And for the record, Your Honor,

22  I got this today, and I gave it to Mr. Pugh.

23  **BY MR. FALGOWSKI:**

24  **Q.**   So does this affidavit that you presented in Superior

25  Court, is it the same affidavit or did you add anything to

*Cunningham – Direct*

 1    it?

 2    **A.**    I only added Line Number 10, that I provide testimony

 3    as a gang expert in an amenability case at Kent County

 4    Superior Court during 2023.

 5    **Q.**    All right.  And --

 6    **A.**    That was the only line I added.

 7    **Q.**    And in Paragraph 11, you list about ten, 12 different

 8    trainings that you had.  You list your different -- the

 9    different training that you've attended; is that correct?

10    **A.**    That's correct.

11    **Q.**    And your hours of investigation and number of

12    investigation?

13    **A.**    That's correct.

14         **MR. FALGOWSKI:**  Your Honor, I would offer that

15    into evidence as part of his credentials.

16         **THE COURT:**  All right.

17         Any objection?

18         **MR. PUGH:**  No, Your Honor.

19         **THE COURT:**  All right.  Let's get it marked and

20    we'll put it in as Government Exhibit 1.

21    **BY MR. FALGOWSKI:**

22    **Q.**    The defense objected to a portion of the presentence

23    report where the defendant was quoted as saying that Dixon

24    said -- in the wiretap said that the gun was going to be

25    $700, and that he's making his off the top.

*Cunningham − Cross*

1          Do you remember that?

2     **A.**   Yes.

3     **Q.**   What did that refer to?

4     **A.**   It refers to the person who's selling the gun for

5     700, means he's making a profit.  He's going to make 700

6     from the top.

7     **Q.**   The gun was sold -- actually, purchased for, like,

8     around 420; is that right?

9     **A.**   That's correct.

10               **MR. FALGOWSKI:**  I believe that covers those.

11               **THE COURT:**  All right.  Did you hand up the

12    exhibit?

13               **MR. FALGOWSKI:**  Yes.

14               **THE COURT:**  I believe we'll mark it as

15    Government Exhibit 1.

16               All right.  Mr. Pugh.

17               **MR. PUGH:**  Thank you, Your Honor.

18    **BY MR. PUGH:**

19    **Q.**   Good afternoon, Detective.

20    **A.**   Good afternoon, sir.  How are you?

21    **Q.**   Sir, can you tell me if you did your dissertation on

22    gangs?

23    **A.**   I did my what?

24    **Q.**   Dissertation.

25    **A.**   I'm not sure what that means.

*Cunningham – Cross*

1   **Q.**   Do you have a PhD?

2   **A.**   No.

3   **Q.**   A master's?

4   **A.**   No.

5   **Q.**   Have you published any peer-reviewed research?

6   **A.**   No.

7   **Q.**   You mentioned your training here.  And I believe it's

8   four of the 12, actually, specifically pertained to gangs

9   on your affidavit?

10  **A.**   Yes.

11  **Q.**   Okay.  And as you did those trainings, at the

12  conclusion of those trainings, was there any assessment

13  done?

14       Did you take an exam?

15  **A.**   No.

16  **Q.**   Was there some sort of evaluation that you had to

17  write a report or a paper on the trainings?

18  **A.**   No.

19  **Q.**   Was there anything that was done to determine that

20  the information conveyed at those trainings was retained?

21  **A.**   No.

22  **Q.**   So your expertise largely comes from your experience

23  as an officer?

24  **A.**   Yes.

25            **THE COURT:**  Mr. Pugh, can I stop you.  Pause

*Cunningham - Cross*

1      there.  I accidentally shut down the system, just brushed

2      it by accident.  Do you want me to start it again just in

3      case you're going to use it?

4                  **MR. PUGH:**  Your Honor, at this point, I would

5      say let's leave it as it.

6                  **THE COURT:**  All right.  Sorry about that.

7                  **MR. PUGH:**  That's quite all right.

8      **BY MR. PUGH:**

9      **Q.**   What is your definition of a gang?

10     **A.**   Three or more individuals that operate together to

11     commit violent felonies or crimes, who also are known to

12     call themselves or use the same logo.  That's actually the

13     Delaware law --

14     **Q.**   I'm familiar.

15          So your experience with gangs is located based off of

16     your investigations in Delaware?

17     **A.**   And other states, also.

18     **Q.**   You've investigated gang members in other states?

19     **A.**   Yes.

20     **Q.**   And what states would they have been?

21     **A.**   Georgia, Maryland.

22     **Q.**   So three states total?

23     **A.**   Approximately.

24     **Q.**   And no experience investigating gangs in California?

25     **A.**   No.

*Cunningham – Cross*

1   **Q.**   And you're not asserting that there are individuals

2   in Dover who are members of a California gang?

3   **A.**   Well, that gang branches out countrywide.

4   **Q.**   So you're saying that there are members of a

5   California gang in Dover?

6   **A.**   It's where it originated, yes.

7   **Q.**   Well -- well, I just want to make sure I'm clear

8   because -- so, for instance, there's terminology that

9   people may use, but different people in different sections

10   may use that same terminology but not be connected.  I

11   mean, even to refer to themselves.

12       And, if I may, ask for clarification.  You have the

13   Philadelphia Eagles and you have the Eagles band, but

14   nobody would say they're the same Eagles.

15       You would agree?

16   **A.**   That's correct.

17   **Q.**   Okay.  But they both refer to themselves as "Eagles"?

18   **A.**   I get it.  Yes.

19   **Q.**   So are you suggesting that there are individuals in

20   Dover who are members of a California gang?

21   **A.**   There are individuals in Dover that represent a

22   California gang.

23   **Q.**   So if those individuals from Dover went to 57th

24   and -- or 52nd and Hoover, they would know who they are?

25   **A.**   All depends on who they're with.  The Dover gang is a

*Cunningham — Cross*

1    branch from a larger gang.

2    **Q.**    Right.  So they could get on plane, fly out to 52nd

3    and Hoover in Los Angeles and say "Hi" to those guys, and

4    they would all know who they are?

5    **A.**    There will probably be some testing and some

6    terminology to gang check them, but yeah.

7    **Q.**    So you're saying they would?  They're a -- it's a

8    national organization?

9    **A.**    It's a nationally known gang.

10   **Q.**    Okay.  So there's a membership role somewhere?

11   **A.**    Yeah.  They have rules, yeah.

12   **Q.**    No, membership role?

13   **A.**    Oh, role.

14   **Q.**    Look -- so, for instance, like, I mean, do they all

15   carry cards?

16   **A.**    No.

17   **Q.**    Is there a Facebook page that lists all the members?

18   **A.**    There's knowledge that they have to know.

19   **Q.**    There's knowledge that they have to know.

20          All right.  Do you know what that knowledge is?

21   **A.**    Not specifically for the Hoovers, no.

22   **Q.**    So there's no way that you could say that somebody

23   here is a member that would be recognized in California?

24   There's nothing you can do to verify that?

25   **A.**    I know of other gang members from different sets in

*Cunningham - Cross*

1    Dover that have gone to California and talked to them.

2    **Q.**   So other people?

3    **A.**   Other individuals, yes.

4    **Q.**   Okay.  Not my client?

5    **A.**   Not that I know of, no.

6    **Q.**   Not Mr. Dixon?

7    **A.**   I can't say that.

8    **Q.**   So you know that Mr. Dixon went to California?

9    **A.**   No.

10   **Q.**   Okay.  So you don't know that?

11   **A.**   I don't that he's gone to California.

12   **Q.**   Okay.  And you have no information that they have

13   this intricate knowledge that would make them a member?

14   **A.**   Well, I know that Mr. Dixon's, I would say, OG or

15   boss of his gang has direct ties to New York and

16   California, has communication with California.

17   **Q.**   So you don't know that Mr. Dixon has that knowledge

18   either?

19   **A.**   Well, it depends on Mr. Dixon's role.

20   **Q.**   But you -- so --

21   **A.**   He might not have the right to talk to the

22   California --

23   **Q.**   Just to clarify my question, you don't know that

24   Mr. Dixon has that knowledge?

25   **A.**   Correct, I don't know.

*Cunningham – Cross*

1    **Q.**    You mentioned that Mr. Dixon's former girlfriend

2    identified him as a Crip?

3    **A.**    That's correct.

4    **Q.**    Do you know where she got that information from?

5    **A.**    Probably from Mr. Dixon.

6    **Q.**    But do you know where she got that information from?

7    **A.**    Not exactly, no.

8    **Q.**    Okay.

9         You would also agree that sometimes terms -- ways of

10   interacting become cool, they become in?

11   **A.**    That's true.

12   **Q.**    And people will use those not because they're a

13   member of any particular group, but because that's what

14   people are doing?

15   **A.**    Possibly.

16   **Q.**    All right.  The same can be said of hand signals or

17   hand signs.  Someone might make a gesture with their

18   hands, but that's not an indication that they're a member

19   of any particular group?

20   **A.**    I don't see the purpose of doing that.

21   **Q.**    So what you're saying is that it is an indication

22   that you are a member of a particular group if you're

23   making hand signals that are associated with that group?

24   **A.**    Member associate, yes.

25   **Q.**    Okay.  There wouldn't be any way around that?

*Cunningham — Cross*

1   **A.**   I wouldn't know any explanation.

2   **Q.**   So basically, hand signs are a symbol of gang

3   membership?

4   **A.**   Yes.  It's a criteria.

5          **MR. PUGH:**  Your Honor, at this time, we'd like

6   to thank you.

7          **THE COURT:**  And I apologize for that --

8          **MR. PUGH:**  It's not an issue, Your Honor.

9

10          **THE CLERK:**  Your Honor, I believe I can get it

11   started from there.

12          **THE COURT:**  Oh, great.  Thank you.

13          Great.

14          **MR. PUGH:**  Thank you.

15          Mr. Merrick, if you could bring up Exhibit A5.

16   **BY MR. PUGH:**

17   **Q.**   And, sir, can you see the hand gesture in this

18   particular picture?

19   **A.**   I do.

20   **Q.**   And you can see that four of the six individuals

21   present are making that same symbol?

22   **A.**   Yep.

23   **Q.**   Would you say that's an indication that they're gang

24   members?

25   **A.**   I don't know what that is.

*Cunningham – Cross*

1  **Q.**  So someone could make a hand signal that's not

2  indicative of them being in a gang?

3  **A.**  Yes, that's true.

4  **Q.**  Okay.  I just want to clarify because previously you

5  were saying something different.

6  **A.**  You put it that way, yes, I agree with that.

7  **Q.**  Pardon.  I apologize.

8  **A.**  It was my --

9  **Q.**  Just to clarify, previously you had said something

10  different.

11  **A.**  I wasn't thinking about this example.

12  **Q.**  So --

13  **A.**  Yes.  I guess you can -- that's not necessarily gang

14  signs, though.

15  **Q.**  Fair enough for the time being.  We'll come back to

16  that one.

17          **MR. PUGH:**  Mr. Merrick, could you bring up

18  Exhibit A6.

19  **BY MR. PUGH:**

20  **Q.**  Are these individuals making gang signs?

21  **A.**  Appear to be.

22  **Q.**  So this is a symbol.  This is individuals making gang

23  signs?

24  **A.**  Person on the right is holding up a "C."  And the

25  individual with the plaid, next to Michael Jackson, is

*Cunningham – Cross*

1    holding up, it looks like an "A," but I'm not sure what

2    gang he's representing, but it appears to be Crip.

3    **Q.**   And you would agree that Michael Jackson and the

4    individual on the far left are making the same symbol?

5    **A.**   Looks like Michael Jackson has an index finger.  I'm

6    not sure what that is.

7    **Q.**   And you don't think --

8    **A.**   I think it's pointing to his -- to the person next to

9    him.

10   **Q.**   So this doesn't qualify as gang symbols either?

11   **A.**   I would -- no, I would say -- not Michael Jackson,

12   but the individuals holding up -- with blue bandannas and

13   the "C."

14   **Q.**   And you would believe that as a result, they're gang

15   members?

16   **A.**   Yes.

17   **Q.**   So Michael Jackson is in the picture here with gang

18   members?

19   **A.**   Yes.  Michael Jackson, also a famous person; they

20   might want a photo with Michael Jackson.

21            **MR. PUGH:**  Mr. Merrick, can you bring up

22   Exhibit A7.

23   **BY MR. PUGH:**

24   **Q.**   Are these individuals making gang signs?

25   **A.**   I'm not sure of what.  I don't know.  I can't

*Cunningham – Cross*

1    identify those as gang signs.

2    **Q.**    So these symbols, with their hands, are not gang

3    signs?

4    **A.**    Actually, it appears the person on the left is

5    holding up a blood gang sign, which is a gang sign.

6    **Q.**    It would appear that he's holding up the Blood gang

7    sign, yes.

8          So he is a Blood?

9    **A.**    Well, there will be other characteristics to put to

10   it, also.  He's not wearing red.

11   **Q.**    Okay.  So previously you had indicated that

12   individuals who hold up their hands in this symbol, and

13   symbols in general, you said, were indicative of being

14   gang members.  In fact, you said, and correct me if I'm

15   wrong, that you couldn't think of any reason why they

16   would do that.

17   **A.**    I don't know the reason why they would be doing that.

18   **Q.**    Earlier you were implying you couldn't think of any

19   reason why they would do that other than being gang

20   members?

21   **A.**    That's correct.

22   **Q.**    But now you're saying that that's not the case?

23   **A.**    I don't know these individuals.  They could be Blood

24   members, I just don't know.  But he is holding a Blood

25   gang sign.  I don't know these people.  I can't identify

*Cunningham — Cross*

1    them.

2    **Q.**    So it would appear that people hold up gang signs and

3    may not be gang members?

4    **A.**    It's a possibility, yes.  I'll go with you there,

5    yes.

6    **Q.**    So you're changing your statement from earlier?  Or

7    you -- you can't change your statement, but changing your

8    position?

9    **A.**    Correct.

10    **Q.**    Individuals may hold up gang signs because they think

11    they're cool?

12    **A.**    I agree with that, yes.

13    **Q.**    Prior to this investigation, you didn't have any

14    experience with Mr. Harmon?

15    **A.**    No.

16    **Q.**    Are you familiar, as a result of this investigation,

17    with Mr. Harmon's record?

18        His --

19    **A.**    Fairly.

20    **Q.**    -- history of coming before the Court?

21    **A.**    Yes.

22    **Q.**    You would agree that Mr. Harmon's criminal record

23    isn't reflective of a typical gang member?

24    **A.**    No, it's not.  It's no -- but it doesn't --

25    **Q.**    That would -- it wouldn't reflect a typical gang

1    member?

2    **A.**    Correct.

3    **Q.**    And you don't know that -- you said you didn't know

4    where Mr. Harmon's sister got her information about

5    Mr. Dixon?

6    **A.**    I don't.

7    **Q.**    And you don't know that Mr. Harmon and Mr. Dixon ever

8    had a conversation about his alleged membership?

9    **A.**    I know they've been together at gang meetings.

10   **Q.**    And how do you -- you know they've been together at

11   gang meetings?

12   **A.**    Yes.

13   **Q.**    Based off of?

14   **A.**    A video.

15   **Q.**    You have a video where Mr. Harmon was at a gang

16   meeting?

17   **A.**    Yes.

18        **MR. PUGH:**    Your Honor, we were never presented

19   such a video.  We were never given an opportunity to

20   look -- or examine this video or determine what basis it

21   would have for indicating that he was at a gang meeting.

22        **THE COURT:**    But you asked the question.

23        **MR. PUGH:**    Your Honor --

24        **THE COURT:**    The Government didn't offer it as

25   proof that that was -- I don't believe they did.  Did you,

*Cunningham – Cross*

1    Mr. Falgowski?

2              **MR. FALGOWSKI:**  Let me make a record here.

3              **THE COURT:**  Yeah.

4              **MR. FALGOWSKI:**  I told Mr. Pugh before we began

5    this, I said, "Look, there's a video."  And he said, "You

6    never told me about the video."  And I said, "I don't plan

7    on offering it into evidence.  But I'm tell- -- I'm

8    warning you that if you open the door with this agent,

9    he's going to tell you this."

10              I also told him that --

11              **THE COURT:**  Well, first of all, you disagree

12   with that?

13              **MR. PUGH:**  Your Honor, no.  We withdraw our --

14   my statement.

15              **THE COURT:**  Okay.

16              **MR. PUGH:**  Yeah.

17   **BY MR. PUGH:**

18   **Q.**  And lastly, Mr. Harmon never had any discussions with

19   the individual who was the subject of the wiretap?

20   **A.**  That's correct.

21   **Q.**  The only person that Mr. Harmon talked to in

22   reference to this case is Mr. Dixon?

23   **A.**  That's correct.

24              **MR. PUGH:**  No, further questions, Your Honor.

25              **THE COURT:**  All right.

1              Any redirect?

2              **MR. FALGOWSKI:**  No redirect.

3              **THE COURT:**  All right.  You may step down.

4              **THE WITNESS:**  Thank you, Your Honor.

5              **THE COURT:**  Great.

6              Do you want to hear argument, then, I guess?

7              **MR. PUGH:**  Your Honor, maybe hear argument.

8              **THE COURT:**  Yep.

9              **MR. PUGH:**  Your Honor, just very briefly.

10     While the -- the detective may have some knowledge of the

11     interaction of individuals involved in alleged gang

12     activity in Dover, his qualifications fall willfully short

13     of what's required for expertise.

14             I know the Court is very familiar with the

15     legal standard for demonstrating expert knowledge and what

16     is required in that circumstance.  And here, Your Honor,

17     we simply don't have the professional history to rise to

18     that level, to demonstrate that he can speak upon this in

19     the matter that's going to provide the Court with the

20     information that will be probative in making this

21     decision.

22             His indications were that it was some training

23     over a number of years in which the information conveyed

24     to him is in no way demonstrated to have been restrained

25     or be able to be applied in a manner that would allow him

1    to make the determinations that need to be made in order

2    to be an expert, Your Honor.

3        So the basis for his so-called expertise in

4    this case would be his experience with law enforcement,

5    Your Honor.  In doing his job, Your Honor.  And there may

6    be circumstances where that can rise to the level that is

7    necessary.  But, however, Your Honor, we need to know his

8    history as an officer.  We would need to know that

9    historically he has applied his knowledge, his training,

10   in a manner that's consistent with what that training was.

11       So, for instance, Your Honor, we would need to

12   know that previous situations where -- for instance, there

13   is a law, actually, in Delaware that prohibits membership

14   in a gang -- that when he's arrested people for that

15   alleged membership, that those arrests actually stuck and

16   that their prosecutions were successful.  We would need to

17   know his history in terms of conduct and personnel record

18   to know that when he's doing his job as a law enforcement

19   officer, he's doing it in the correct and appropriate

20   fashion consistent with his training.

21       Your Honor, at this point, all we know is that

22   he's had some training at sometime in which information

23   was conveyed to him, that we don't know that he retained

24   and we don't know that he's used successfully.  There's

25   not the record of expertise or knowledge that's typically

1    demonstrated with a person who has the credentials from

2    their education, from their publication record, or, Your

3    Honor, even previous application of that knowledge that

4    demonstrates that they have the wherewithal to be

5    considered an expert.

6         So in this case, Your Honor, his testimony as

7    an expert should not be allowed.

8         **THE COURT:**  All right.  Lets --

9         **MR. FALGOWSKI:**  In response to that --

10        **THE COURT:**  I'm going to give you a chance to

11   respond.  I just want to ...

12        Do I need expert testimony to make a factual

13   finding that Crips are a well-known gang in the United

14   States?

15        **MR. PUGH:**  Your Honor, I don't think expert

16   testimony would be needed for that.

17        **THE COURT:**  Do I need expert testimony to make

18   findings of fact that people in gangs, like Crips, use

19   hand signals?

20        **MR. PUGH:**  No, Your Honor.  I don't think that

21   would be necessary.

22        **THE COURT:**  So what do I need expert testimony

23   to make a finding of fact that you challenge?

24        **MR. PUGH:**  If I may, Your Honor.  If the Court

25   is saying, simply based off his experience as an officer,

1    not finding him as an expert, that the Court is prepared

2    to rule against our objections, Your Honor, then we would

3    accept that, Your Honor, and go along with that, given the

4    testimony that was provided here.

5            **THE COURT:**  But why would that -- I'm trying to

6    figure out how that helps you.

7            I mean, in other words, are you thinking, then,

8    you could challenge on appeal that I made the findings of

9    fact without expert testimony?

10           **MR. PUGH:**  Your Honor --

11           **THE COURT:**  Like, why does this matter, then?

12           **MR. PUGH:**  Well, Your Honor, I think we simply

13   didn't get a chance to completely work through this and,

14   perhaps, with the Government beforehand, and so we weren't

15   able to necessarily fully determine what was going to

16   be -- how the Court was going to handle this testimony or

17   what it would be.

18           **THE COURT:**  All right.  So let's just say for

19   argument's sake -- and I actually think the detective

20   would qualify as an expert.  I don't think -- I mean,

21   under Rule 702, there doesn't have to be a degree, in

22   particular, associated with the gangs.  It can be based on

23   experience, not just educational degrees.  The detective

24   talked about, though, the training he has received and his

25   extensive experience.

1        But put all of that aside, I'm trying to figure

2   out why I would need to even resolve the objection.  It

3   sounds like what you're saying is, you object to him being

4   an expert, but now you're not objecting to there being a

5   factual basis for me to overrule the objections to the

6   proposed findings of fact.

7            **MR. PUGH:**  Your Honor, and I apologize if I was

8   unclear, but it sounds like the Court has indicated --

9            **THE COURT:**  Indicate --

10            **MR. PUGH:**  Okay.

11            **THE COURT:**  Don't worry about what I'm

12   indicating.  What's the objection?

13            **MR. PUGH:**  Your Honor, we objected to those --

14   to the idea that those were gang statements attributing

15   gang membership to my client, Your Honor.  So if the Court

16   is simply saying that -- or if the Government was simply

17   going to say that in their experience, he's heard other

18   people use those terms and --

19            **THE COURT:**  That's what he said.

20            **MR. PUGH:**  Okay.

21            **THE COURT:**  That's what he said.

22            **MR. PUGH:**  Your Honor, we can't say that he

23   hasn't heard those -- other people use those terms.

24            **THE COURT:**  Okay.

25            **MR. PUGH:**  Okay.  So but --

1          THE COURT:  So what do you think the terms are?

2          MR. PUGH:  Your Honor, what we're saying is

3     that based off it, though, we -- you can't say that those

4     were used as a gang greeting in this instance.  That's the

5     objection, Your Honor.

6          THE COURT:  All right.  What about the

7     wheelchair symbol that your client has tattooed on his

8     arm?

9          MR. PUGH:  Your Honor, again, if he's seen a

10    member that he considers to have been a Crip use that,

11    then he's seen that.  However, my client indicated where

12    that came from in his own experience in his life in

13    reference to his grandmother.  They've -- the testifying

14    detective --

15         THE COURT:  Well, wait.  What evidence is there

16    of that?

17         MR. PUGH:  My client's statement.

18         THE COURT:  Where's that in evidence?

19         MR. PUGH:  Your Honor, that was part of his PSR

20    interview.

21         THE COURT:  Okay.  And I'm supposed to give

22    that weight when I've got an objection?  Like, you made

23    the Government put on evidence.  You're saying I'm

24    supposed to just accept what was represented to the PSR?

25         MR. PUGH:  As from the -- as the statement of

1  my client, yes, Your Honor.  They're attempting to divine

2  what is in his head, as opposed to going along with his

3  statement as to what it means.

4           Without question, they can't speak to my

5  client's mind and what is in his head.  They can only look

6  at what other people have done and trying to group my

7  client with that -- those other individuals.

8           **THE COURT:**  So on June 23, 2022, when your

9  client responded to Mr. Dixon with the words "West

10 gr52vin, cuhz," unquote, what's that mean?

11          **MR. PUGH:**  Pardon me, Your Honor?

12          **THE COURT:**  What does that mean?

13          **MR. PUGH:**  Your Honor --

14          **THE COURT:**  When your client responded, "West

15 gr52vin, cuhz," unquote, what was he conveying?

16          **MR. PUGH:**  Your Honor, that's clearly a

17 greeting.  I'm not denying that, Your Honor.  But I know

18 individuals who will greet each other with "As-salamu

19 alaikum," and they're not Muslim.

20          But it became --

21          **THE COURT:**  Wait.

22          **MR. PUGH:**  All right.

23          **THE COURT:**  Okay.  Sorry.

24          **MR. PUGH:**  Pardon me.

25          **THE COURT:**  You said it so fast.

1            **MR. PUGH:**  Who will greet each other with

2    "As-salamu alaikum."  It's an Arabic greeting used by

3    Muslims, but it became cool.  So there were a lot of

4    individuals in the city who would do that, because that's

5    what they heard other people do.  That's what they heard

6    older people do.

7            **THE COURT:**  Okay.  But what's the objection?

8    Is it the objection that -- that you're afraid I'm going

9    to make a finding that the defendant is a member of the

10   West 52 Crips organization?

11           Is the objection that you're worried I'm going

12   to make a finding of fact that he conveyed -- in fact,

13   let's be real specific.  I mean, you object to

14   Paragraph 24, right?

15           **MR. PUGH:**  Yes.

16           **THE COURT:**  All right.

17           **MR. PUGH:**  Your Honor, just for clarification.

18   As it references there, it shows 22 to 23, which is now 24

19   and 25.  And so when you say "24," I don't know which

20   particular one, because it groups them together.  So I

21   apologize.

22           **THE COURT:**  You don't have to apologize.  But

23   let's just -- I've got the revised version.

24           **MR. PUGH:**  I can turn to Paragraph 24, if the

25   Court would like --

 1              **THE COURT:**  All right.  Yep.  Do that.

 2              **MR. PUGH:**  -- if that would be easier.  I was

 3     looking at the objections.

 4              **THE COURT:**  All right.  This is the March 26,

 5     2024 report.  I'll ask the probation officer to confirm.

 6     This is the most recent revised report, correct?

 7              **THE PROBATION OFFICER:**  Correct, Your Honor.

 8              **THE COURT:**  So we're dealing with Paragraph 24.

 9     So you object to that.

10          So the first sentence:  "Investigators located,

11     on Mr. Harmon's cell phone, a text message conversation

12     dated June 23, 2022, 3:04 p.m. between himself and

13     Mr. Dixon.  At the beginning, Mr. Dixon texted 'West M8 --

14     m8v3n.'  And Mr. Harmon responded, 'West gr52vin, cuhz,'"

15     unquote.

16          Do you object to that sentence?

17              **MR. PUGH:**  I do not object to the sentence.

18              **THE COURT:**  All right.  Next sentence:

19     "Investigators recognized these to be gang greetings."

20          Do you object to that?

21              **MR. PUGH:**  No, Your Honor.

22              **THE COURT:**  All right.  And the remainder of

23     that sentence says:  "Respectively, of the Eight Trey

24     Gangster Crips, and the Five Duce Hoover Gangster Crips,

25     which are separate sects of the Crips."

1          So you don't object to that, right?

2          **MR. PUGH:**  No, Your Honor.

3          **THE COURT:**  All right.  The next sentence says:

4  "As to Mr. Harmon's Five Duce Hoover Gangster Crips, the

5  gang originated on the West Coast in Los Angeles at 52nd

6  and Hoover Streets, thus Five Duce Hoover."

7          Do you object to that?

8          **MR. PUGH:**  No, Your Honor.

9          **THE COURT:**  All right.  So really, there's no

10  objection to that.  That's moot.

11          All right.  So next, do you object to

12  Paragraph 25?  "These gang members" -- now, this is

13  referring to these Five Duce Hoover gang members,

14  right? -- "variously greet one another 'What's grooving,'

15  thus Mr. Harmon texted 'West gr52vin.'"

16          All right.  Do you object to that?

17          **MR. PUGH:**  No, Your Honor.

18          **THE COURT:**  Then it says:  "Investigators have

19  advised that Five Duce Hoover Gangster Crips gang members

20  are active in Delaware, including in Dover.  As to

21  Mr. Dixon's text greeting, his Eight Trey Gangster Crips

22  variously greet one another, 'What's moving?'  Thus,

23  'm8v3n,'" period.

24          Do you object to that?

25          **MR. PUGH:**  No, Your Honor.

1        THE COURT:  All right.  So then, how about do

2   you want to, then tell me, is there anything in 26 that

3   you object to?

4        MR. PUGH:  Your Honor, originally -- I just

5   want to check this, Your Honor, if I may.

6        THE COURT:  Sure.  Because you've now heard the

7   testimony.  So let's just make sure.

8        MR. PUGH:  The only thing we objected to from

9   the beginning was that the allegation that Mr. Harmon was

10  basically soliciting a sale there, that's all, Your Honor.

11       THE COURT:  Hold up.  Show me the sentence, so

12  I know what it is.

13       MR. PUGH:  So the very first line, it says,

14  "Mr. Harmon offered to buy a gun for Mr. Dixon."  Other

15  than that, we've never had an objection to that paragraph.

16       THE COURT:  Okay.  So you object to the line,

17  "Mr. Harmon offered to buy a gun for Mr. Dixon"?

18       MR. PUGH:  Correct.

19       THE COURT:  All right.  Mr. Falgowski, what do

20  you say to that?

21       MR. FALGOWSKI:  I say that we can qualify that.

22  We can have it read, instead, "After the gang greetings

23  were exchanged, investigators believe Mr. Harmon offered

24  to buy a gun for Mr. Dixon."

25       THE COURT:  All right.  Now, what's the basis

1    of that?  In other words, right after that sentence, it

2    says, "Mr. Harmon texted, 'You got a car.  Let's do it.

3    How much you trying to spend?'"

4           Is that the language that you were saying is

5    indicative of offering to buy the gun?

6           **MR. PUGH:**  Yes.  "How much you trying to

7    spend?"  And then he says, "It will take me 30 minutes.

8    I'll be filling out paper.  They put it in the computer."

9    That's a classic -- when you go to a gun shop, the gun

10   shop takes your information.  They run it through the

11   computer to see if you have a criminal history.

12          **THE COURT:**  All right.  But what I'm just

13   trying to -- and it's the way the report's written, and

14   I'm sure you all have had more input -- well, you were

15   offered the opportunity to have input.

16          Now that I understand the objection, the debate

17   is the meaning of the texted terms.

18          In other words, what I'm getting at is, there's

19   no other text that's not quoted here on which the

20   Government is saying it believes Mr. Harmon offered to buy

21   a gun; is that right?

22          **MR. FALGOWSKI:**  That's correct.

23          **THE COURT:**  Okay.

24          **MR. FALGOWSKI:**  It's the --

25          **THE COURT:**  It's reading this language that's

1    quoted in here.

2           **MR. FALGOWSKI:**  That's why I suggested we read,

3    "the investigators believe" or "interpret" or "the

4    Government submits."

5           **THE COURT:**  Okay.

6           Well, let me ask this:  Mr. Pugh, would you

7    object if it said, "After the gang meetings, greetings

8    were exchanged, Mr. Harmon agreed to buy a gun for

9    Mr. Dixon"?

10          Would you dispute that or would you challenge

11   that?

12          Is the objection who made the initial offer or

13   is the objection that this dialogue that is quoted in the

14   remainder of the paragraph, shows that the two men agreed

15   that Mr. Harmon would go buy a gun for Mr. Dixon?

16          **MR. PUGH:**  Your Honor, I would say,

17   contextually, that's a little unclear.  But I understand

18   the Court's -- what the Court is trying to get at.  I

19   agree with the wording that the Government suggested,

20   which is that officers believe that Mr. Harmon was making

21   an offer.

22          **THE COURT:**  Okay.  Well, if you'll agree to

23   that, we'll put that.  I mean, I read the text, it looks

24   to me like there's an agreement to go buy a weapon for

25   Mr. Harmon -- I mean, for Mr. Dixon.  That's what it looks

1    like to me.

2                But you're saying we can change Paragraph 26 to

3    say, "After the gang greetings were exchanged" -- well,

4    actually, what it should read properly is, "The Government

5    believes that after the gang greetings were exchanged,

6    Mr. Harmon offered to buy a gun for Mr. Dixon."

7                And you're okay with that?

8            **MR. PUGH:**  Your Honor, that wording is

9    sufficient, yes.

10           **THE COURT:**  All right.  Well, we'll just revise

11   the report.

12               Does that take care of it, Mr. Falgowski?

13           **MR. FALGOWSKI:**  I believe it does, yes.

14           **THE COURT:**  Okay.

15               All right.  That takes care, then, of the

16   objections, I believe, between 24 and 27.

17               Is that right, Mr. Pugh, or is there anything

18   else?

19           **MR. PUGH:**  No, Your Honor, that would be all

20   there.

21           **THE COURT:**  All right.  Then, the only -- I

22   believe, then, is the only objection left the handicap

23   symbol?

24           **MR. PUGH:**  Yes, Your Honor.

25           **THE COURT:**  All right.  And that's

1   Paragraph 93, right?

2          And I believe the sentence that is objected to

3   is in the middle of that paragraph, quote, "It should be

4   noted that according to information available on the

5   Internet, the handicap symbol is an emoji used by the

6   Crips street gang," unquote.

7          And it does say what you just mentioned, which

8   is -- and it's in the report -- "During the Presentence

9   Report interview, Mr. Harmon specified that his tattoo was

10  in memory of his paternal grandmother who required the

11  assistance of a wheelchair."

12         Okay.

13         **MR. PUGH:**  That's correct, Your Honor.

14         **THE COURT:**  I mean, I just think it's

15  undisputed that there is information on the Internet that

16  the handicap symbol is used by Crips street gangs.

17  Whether that's true or not, I guess, you could argue is a

18  different story.  But the way the sentence reads, I mean,

19  anybody could just go on the Internet and see there's

20  information available that says that.

21         So the statement that you're challenging, it

22  should be noted, that according to information available

23  on the Internet, the handicap symbol is an emoji used by

24  Crips.

25         **MR. PUGH:**  Very well, Your Honor.

1          **THE COURT:**  Well, when you say "very well" -- I

2     mean, I think -- what I'm trying to get at is, what's the

3     real objection?

4               Isn't, really, your objection is that I'm going

5     to find that that handicap symbol on his arm indicates

6     either he is a Crip or wants to be a Crip, right?

7          **MR. PUGH:**  Your Honor, yes.  What the Court

8     just said is, this is what is available.  The Court laid

9     out specifically what it's -- it's --

10         **THE COURT:**  Right --

11         **MR. PUGH:**  -- believe is finding --

12         **THE COURT:**  -- well, it is available.  But I've

13    got --

14         **MR. PUGH:**  Right.

15         **THE COURT:**  But put aside the PSR.  What's

16    weird here is the PSR doesn't say -- I don't believe the

17    PSR says the defendant is a Crip, does it?

18         **THE PROBATION OFFICER:**  No, Your Honor.

19         **THE COURT:**  Okay.

20         **MR. PUGH:**  Certainly, Your Honor, there's

21    concern that the Court would make an inference.  And so --

22         **THE COURT:**  All right.

23         **MR. PUGH:**  Yes.

24         **THE COURT:**  Let me tell you the inference I do

25    make, and then let me ask whether the Government wants me

1    to make more of an inference, or whether the defendant is

2    going to object.

3            It seems clear to me, whether the defendant is

4    a Crip or not, he's associating with dangerous people who

5    are felons who want access to guns that they don't have,

6    that are either members of the Crips, or are portraying

7    themselves using signals that are known to be used by the

8    Crips.

9            Do you object to any of that?

10           **MR. PUGH:**  Your Honor, I would object to the

11   felon statement.  The individual in question, Mr. Dixon

12   was not a felon at the time that my client was dealing

13   with him.

14           **THE COURT:**  Was he a person prohibited?

15           **MR. PUGH:**  He was not, Your Honor.

16           **THE COURT:**  Okay.

17           All right.  And that's true, actually.

18           **MR. FALGOWSKI:**  That's true.

19           **THE COURT:**  So I misspoke.  I mean, because I

20   know that's true.

21           And is there any evidence of a particular felon

22   ever being -- or a prohibited person conversing with the

23   defendant for the purchase of the firearm?

24           **MR. FALGOWSKI:**  No, Your Honor.

25           **THE COURT:**  Right.  Okay.

```
 1              All right.  So then, other than the felon, you

 2    don't -- I mean, that was my misspeaking, because you're

 3    right about Mr. Harmon.

 4              MR. PUGH:  Well, given that there's no felon,

 5    Your Honor, we would also object to the term "dangerous

 6    people."  But clearly --

 7              THE COURT:  Well, dangerous people.  I mean,

 8    we've got a number of the guns that your client purchased

 9    ending up in crimes, right?

10              MR. PUGH:  That is correct, Your Honor.  But

11    there is no connection between any of those individuals

12    and my client.

13              THE COURT:  Well, he bought the guns.

14              MR. PUGH:  There is no --

15              THE COURT:  There's no direct connection.

16              MR. PUGH:  There's no direct connection.  If

17    you want to say a throughline from the purchase of the

18    gun, Your Honor, obviously, we can't object to that --

19              THE COURT:  Yeah.

20              MR. PUGH:  -- but there's no direct connection.

21              THE COURT:  Right.  Okay.  And that's -- I

22    think you'll -- that's undisputed, too, right?

23              MR. FALGOWSKI:  That's not disputed.

24              THE COURT:  Yeah.

25              MR. PUGH:  That's what we were just -- with the
```

1      associating, Your Honor.  But other than that, Your Honor.

2              **THE COURT:**  Right.

3              The only direct connection they have is the

4      Harmon one.

5              **MR. PUGH:**  Pardon me?

6              **THE COURT:**  Harmon is the direct connection.

7              **MR. PUGH:**  You're referring to?

8              **THE COURT:**  I'm sorry.  Harmon.

9              **MR. PUGH:**  Yes.

10             **THE COURT:**  I meant Dixon.

11             **MR. PUGH:**  Yes.

12             **THE COURT:**  And I apologize.  Earlier in the

13     hearing I also misspoke and used -- I referred to the

14     defendant as "Dixon" by accident, but correct.  The

15     only -- the direct connection is the Harmon, which is the

16     defendant, Dixon connection?

17             **MR. PUGH:**  Correct, Your Honor.

18             **THE COURT:**  Okay.  All right.

19             All right.  So then, it sounds like there is no

20     objection, or you're withdrawing the objection to

21     Paragraph 93.

22             **MR. PUGH:**  Yes, Your Honor.

23             **THE COURT:**  Okay.

24             All right.  Does that take care of -- are there

25     any other, then, objections to the Presentence Report?

 1            **MR. PUGH:**  Not from the defense, Your Honor.

 2            **MR. FALGOWSKI:**  Not from the Government.

 3            **THE COURT:**  And does the Government want me to

 4    make -- I mean, I already have, essentially, made a

 5    finding.  I mean, I found the detective to be a credible

 6    witness.  I do think he's got sufficient training to opine

 7    about gang activity, but it sounds like I don't really

 8    have to make any findings of fact based on that.

 9            Do you want me to say anything else?

10            **MR. FALGOWSKI:**  No, Your Honor.  I referenced,

11    before he -- when he testified, I referenced a two-page

12    affidavit and said I would offer into evidence.  I

13    neglected to number it and actually offer it as an

14    exhibit --

15            **THE COURT:**  Okay.  So why don't you do that

16    now.

17            **MR. FALGOWSKI:**  -- so I would offer that.

18            **THE COURT:**  Are there any objections?

19            **MR. PUGH:**  No, Your Honor.

20            **THE COURT:**  All right.  That's fine.  So that

21    will be Government Exhibit Number 2.  We'll make it part

22    of the record.

23            All right.

24            **MR. PUGH:**  Does the Court have additional

25    questions?

1          **THE COURT:**  Yeah, sure.

2          **MR. PUGH:**  No, did the Court have --

3          **THE COURT:**  Oh.  No.  I think -- well, given

4    that, there are -- so there are no longer any objections

5    to the Presentence Report.  So I'm going to adopt the

6    findings of fact and conclusions of law consistent with

7    what we've discussed of the Presentence Report.

8          And as a result of that, the defendant has a

9    Criminal History Category of one, a total offense level of

10   13.  The guidelines call for a range of 12 to 18 months.

11   A term of supervised release between one and three years.

12   The maximum is three years.  The defendant is ineligible

13   for probation.  A fine.  I'm going to waive the fine.  So

14   I'm not going to worry about the guideline range there.

15   Restitution is not applicable.  And there's a special

16   assessment of $100.

17         Mr. Harmon, do you have any questions about the

18   Presentence Report that you would like answered?

19         **THE DEFENDANT:**  About the conversation between

20   me and Mr. Shaw?

21         **MR. PUGH:**  No, no, no.

22         **THE COURT:**  No, about the Presentence Report.

23   In other words, you've heard your -- Mr. Pugh had some

24   challenges that ultimately were withdrawn.

25         **THE DEFENDANT:**  Yes, sir.

1          THE COURT:  Do you understand that?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Do you have any questions about the

4     Presentence Report?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  Okay.  All right.  Then because,

7     you know, for instance, I told you what your ultimate

8     offense level is.  Do you have any questions about how you

9     get to that level?

10          THE DEFENDANT:  If you can, just explain it to

11     me.

12          THE COURT:  All right.  I will do that.  So

13     then we've got -- so for Count 1, your base offense level

14     is a 12.  That's in Paragraph 45.

15          And then there's a four-level increase in that

16     specific, if it's called a specific offense

17     characteristic.  This is in Paragraph 46.  Do you see

18     that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And that's because of the number of

21     firearms that are involved.  Do you understand that?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  All right.  So that gives you an

24     adjusted offense level of 16.  And because you are, what

25     we call, doing early acceptance of responsibility because

1      of your timely plea, you get -- the Government's agreed

2      you get three levels off instead of two.  So your total

3      offense level is 13.  All right?

4                  **THE DEFENDANT:**  Yes, sir.

5                  **THE COURT:**  Do you have any questions about

6      that?

7                  **THE DEFENDANT:**  No, sir.

8                  **THE COURT:**  All right.  Then you're in the

9      Criminal History Category, the lowest category, that's a

10     1.  And then when you do the -- therefore, that's why

11     you're looking at a guideline range of 12 to 18 months.

12                 Do you understand?

13                 **THE DEFENDANT:**  Yes, sir.

14                 **THE COURT:**  All right.

15                 All right.  Now, there are -- are there any

16     motions for a departure from the Government?

17                 **MR. FALGOWSKI:**  No, Your Honor.

18                 **THE COURT:**  From the defense?

19                 **MR. PUGH:**  No, Your Honor.

20                 **THE COURT:**  All right.  So then, the Government

21     is moving for an upward variance; is that right?

22                 **MR. FALGOWSKI:**  That's right, Your Honor.

23                 **THE COURT:**  All right.  And is there a motion

24     for a variance from the defense?

25                 **MR. PUGH:**  There is not, Your Honor.

1          **THE COURT:** Okay. All right. So let's hear

2     arguments on the variance.

3          What is it you are asking? I know you want to

4     go above it. I didn't see a recommendation specifically.

5          **MR. FALGOWSKI:** I didn't. But the Government

6     is going to recommend, I say, at least 36 months. If the

7     Court went higher, then the Government would be pleased.

8     But the Government is arguing no less than 36 months. Let

9     me explain how and why the Government says that.

10          The first draft of this Presentence Report

11     actually imposed five levels for trafficking, and then

12     that was removed. And in this case, the Government

13     submits that that five points for trafficking is because

14     that's serious conduct. And the Government submits that

15     regardless of how the guidelines speak to the trafficking

16     and how they define it, the conduct in this case is

17     serious. And that's one of the 3553 factors. It's

18     serious. And the Government details in its sentencing

19     memorandum how these guns were recovered and how they were

20     used on one of the --

21          **THE COURT:** Let me ask you this: Why didn't

22     the Government charge him with trafficking?

23          **MR. FALGOWSKI:** Why didn't the Government

24     charge with trafficking? You're talking about the new

25     statute to trafficking?

1          THE COURT:  Was there a statute in existence at

2     the time that --

3          MR. FALGOWSKI:  No, there wasn't.

4          THE COURT:  Right.

5          MR. FALGOWSKI:  Yeah.  So we didn't charge him

6     with trafficking because that was enacted, I believe, in

7     '23.  It certainly was enacted after this.

8          THE COURT:  Right.

9          MR. FALGOWSKI:  But the details of the way in

10    which the guns were used, the timing of the guns.  One was

11    used the very day after.  And so, you know, if one's

12    drawing inferences, one inference is the defendant could

13    have been the shooter because he had the gun the day

14    before.  The inference could be that if that gun turned

15    over so quickly, that somebody was using that gun in

16    connection with a shooting of that car, then the defendant

17    knew about it.

18         THE COURT:  Right.  I just want to make the --

19    I want to just go over that.  So in terms of the

20    connection, the first one is that there's a 40 caliber

21    semiautomatic pistol that the defendant bought on July 21,

22    2020.  And that was recovered the next day in the

23    possession of a felon, correct?

24         MR. FALGOWSKI:  Correct.

25         THE COURT:  All right.  And it was a five-time

1    felon.  Who was that?

2              **MR. FALGOWSKI:**  That was Coleman, Devon

3    Coleman.  And that's the person the agent testified to.

4    He was the subject of that wiretap investigation.  Coleman

5    was a bad guy.  He was one of the five or six gang members

6    that were the subject of the wiretap that the agent --

7    that the detective was the affiant to.

8              **THE COURT:**  All right.  Now, when Coleman was

9    arrested the next day, he's ultimately charged and he's

10   actually sentenced in Superior Court to 29 years in jail,

11   correct?

12             **MR. FALGOWSKI:**  Correct.

13             **THE COURT:**  All right.  What was he sentenced

14   on?

15             **MR. FALGOWSKI:**  He was sentenced on that gun.

16             **THE COURT:**  Just on the possession?

17             **MR. FALGOWSKI:**  He was sentenced -- no.  He was

18   a five-time felon before he got possession of the gun.  He

19   was charged with drugs and guns.

20             **THE COURT:**  All right.  But he wasn't charged

21   in shooting that gun; although, it could have been

22   possession?

23             **MR. FALGOWSKI:**  He wasn't charged with shooting

24   that gun.

25             **THE COURT:**  All right.  But he was five-time

1    convicted felon at the time; he was found in possession of

2    the gun that had been purchased the previous day by the

3    defendant?

4              **MR. FALGOWSKI:**  Correct.

5              **THE COURT:**  All right.

6              All right.  Then there was a 9-millimeter

7    semiautomatic pistol the defendant bought on April 10,

8    2020.  And that was used in Dover in a shooting the

9    following day, correct?

10             **MR. FALGOWSKI:**  Correct.

11             **THE COURT:**  All right.  And this was a shooting

12    at Capital Park in Dover.  There were 12 9-millimeter

13    shell casings from the shooting.  There were three young

14    black males wearing masks who got out of a silver vehicle

15    and opened fire on another car.

16             And, basically, we know that the gun purchased

17    by the defendant was used -- the gun was not recovered

18    that day, but it was subsequent testing, right, of the

19    bullet casings are what confirmed that the day after the

20    defendant bought that gun, it was used in the shooting; is

21    that right?

22              **MR. FALGOWSKI:**  That's right.

23             **THE COURT:**  All right.  And then the gun was

24    recovered about a year later from a 23-year-old felon; is

25    that right?

1          **MR. FALGOWSKI:**  Correct.

2          **THE COURT:**  All right.  And that --

3    unbelievably, that 23-year-old felon received only a

4    sentence of one year in Superior Court.

5          **MR. FALGOWSKI:**  That's right.

6          **THE COURT:**  All right.

7          Mr. Pugh, those facts, you don't have anything

8    to challenge those facts, correct?

9          **MR. PUGH:**  No, Your Honor.

10          **THE COURT:**  All right.

11          All right.  Now, there's a shooting referenced

12    in the Government's memoranda by the same 23-year-old

13    felon.  And it involved a 40 caliber GLOCK, correct?

14          **MR. FALGOWSKI:**  Correct.

15          **THE COURT:**  All right.  Now, was that GLOCK

16    purchased by the defendant?

17          **MR. FALGOWSKI:**  It was not.

18          **THE COURT:**  Okay.

19          So the discussion of that GLOCK in the

20    Government's memorandum is really just, I take it, to show

21    that -- how dangerous the 23-year-old felon was who used

22    the 9-millimeter semiautomatic pistol.  Well, he used that

23    for sure -- or he was found in possession of it in May of

24    2021.

25          But that gun was used in the shooting on

1    April 11, 2020, correct?

2              **MR. FALGOWSKI:**  That's correct.

3              **THE COURT:**  All right.

4              All right.  And then there's a 9-millimeter

5    semiautomatic pistol that the defendant bought on

6    September 2, 2020.  And approximately eight months later,

7    that gun was found in the possession of a different

8    23-year-old felon who was on probation for rape; is that

9    right?

10             **MR. FALGOWSKI:**  Correct.

11             **THE COURT:**  All right.  Mr. Pugh, are there any

12   facts or any challenge to that fact finding?

13             **MR. PUGH:**  No, Your Honor.

14             **THE COURT:**  Okay.

15             All right.  Then the Government has also set

16   forth in its memorandum that a 40 caliber semiautomatic

17   pistol purchased by the defendant on June 1, 2021 was

18   recovered about two months later by Dover Police

19   Department at the Whatcoat Village apartment complex.  The

20   apartment in which it was found, at the time the police

21   entered, there were four juveniles; three of whom were

22   charged in recent shootings.

23             Again, is that fact disputed, Mr. Pugh?

24             **MR. PUGH:**  No, Your Honor.

25             **THE COURT:**  So I make that finding.

1          The Government has also set forth in its

2     memorandum that a 9-millimeter semiautomatic pistol the

3     defendant bought on July 19 was recovered with nine live

4     rounds in the magazine in December of 2023, in the

5     possession of a probation -- a person on probation -- who

6     was on probation for carrying a concealed deadly weapon.

7          Mr. Pugh, do you dispute that?

8          **MR. PUGH:**  Court's indulgence.

9          No, Your Honor.

10         **THE COURT:**  All right.  I'm going to make that

11    finding of fact.

12         Mr. Falgowski, if you could, on Page 3 of your

13    memorandum, the next gun you discuss is the 9-millimeter

14    semiautomatic pistol the defendant bought on April 29,

15    2020.

16         Do you see that?

17         **MR. PUGH:**  Yes, Your Honor.

18         **THE COURT:**  And that was also apprehended or

19    found in the possession of a male who was fleeing from a

20    Wilmington police officer.  So he's involved in some kind

21    of criminal activity, at the very least, flight, unlawful

22    flight.

23         **MR. FALGOWSKI:**  It was a traffic stop --

24         **THE COURT:**  Traffic.

25         **MR. FALGOWSKI:**  -- and he ran --

1              THE COURT:  Right.

2              MR. FALGOWSKI:  -- and he was a felon.

3              THE COURT:  Well, that's what I wanted to ask

4    you.  It wasn't clear to me from the papers that he's a

5    felon.  That's exactly what I wanted to ask you.  It says

6    he was sentenced to one-year incarceration, but I don't

7    see if it says that he was a convicted felon.

8              MR. FALGOWSKI:  He was a felon.

9              THE COURT:  He was.

10             Mr. Pugh, do you dispute that?

11             MR. PUGH:  No, Your Honor.

12             THE COURT:  All right.  And I'm going to make

13   that finding as well.  So that means another pistol that

14   the defendant bought, this one on April 29, 2020, was

15   recovered less than four months later in the possession of

16   a convicted felon.  So an unlawful possession.  Who was

17   also, then, after a traffic stop, ran from the police, and

18   the gun was loaded and had nine more rounds -- well, it

19   had one round in the chamber.  It had nine more rounds in

20   an extended magazine.

21             All right.  Then, finally, there's a

22   9-millimeter pistol that the defendant bought on April 10,

23   2020, recovered in February of 2020 by Dover police after

24   the man had used it in aggravated menacing of his

25   girlfriend.  So as part of a criminal activity.

 1              Was that defendant, do you know, Mr. Falgowski,

 2    was he a convicted felon?

 3              **MR. FALGOWSKI:**  He was not a person prohibited.

 4              **THE COURT:**  He was not.  Okay.

 5              **MR. FALGOWSKI:**  Though he later was sentenced

 6    in that matter for the aggravated menacing.

 7              **THE COURT:**  Right.  And it was used as part of

 8    a crime, aggravated menacing.

 9              All right.  Mr. Pugh, do you dispute that fact?

10              **MR. PUGH:**  No, Your Honor.

11              **THE COURT:**  All right.  I'm going to make the

12    finding of that fact, then.  Okay.

13              All right.  So now, I just wanted to make those

14    specific findings.

15              Then go ahead, Mr. Falgowski, then.  You're

16    asking, then, for trafficking.  And, basically, there are

17    no other guns besides those, right?  But all of those guns

18    end up either in a crime -- well, actually, in criminal

19    activity because they're either used in furtherance of a

20    crime, or they're in the possession of a person

21    prohibited, which is a crime.

22              **MR. FALGOWSKI:**  Correct, Your Honor.

23              **THE COURT:**  Okay.  All right.

24              **MR. FALGOWSKI:**  And so seven out of 19 guns

25    have been recovered.  We still have 12 guns out there.

1    And we can see what's happened to these seven.  And we can

2    only wait to find out the rest of these guns as they

3    appear.

4         THE COURT:  Now, you've asked -- the defendant

5    was interviewed post trial.  So you've asked him to give

6    you information about where these guns ended up, correct?

7         MR. FALGOWSKI:  Yes.  He was interviewed by the

8    detective.  It was about a two-and-a-half-hour interview.

9         THE COURT:  Right.

10        MR. FALGOWSKI:  And it was only after the

11   two-hour mark that the defendant admitted that he gave

12   Dixon the gun.  And so the agent said, "Well, let's go

13   through the rest of them."  He had a pile of papers in

14   front of him.  And each time they came up with a different

15   gun, the defendant said, "Pass, pass.  That was a long

16   time ago," and such.

17        And the detective asked him, "What did you do

18   with these guns?"  And he said, "I put them -- I shot them

19   and I put them up.  I went with my cousins.  And I would

20   shoot the gun and then I would put them up."  Meaning,

21   that he would, like, put them on a shelf, you know, put

22   them away.

23        The defendant -- or the one gun hadn't been

24   recovered.  And so, of course, the officer didn't ask him

25   about it.  "What about the gun that was used the very next

1    day?"  The Government just doesn't have any information

2    about what happened once the defendant left the gun shop.

3    And so the --

4         **THE COURT:**  I just want to be clear on that.

5    So wait.  The defendant is arrested on what day?

6         **MR. FALGOWSKI:**  He was arrested the day of

7    his -- the day that he gave his post-arrest statement, and

8    that was ...

9         **THE COURT:**  So July 21 is when he goes into

10   First State Firearms.

11        **MR. FALGOWSKI:**  He was arrested -- Paragraph 17

12   says that on July the 28 of '22, he was arrested in

13   Delaware.

14        **THE COURT:**  June 28 is what Paragraph 17 says.

15        **MR. FALGOWSKI:**  Ah, yes, June, June 28.

16        **THE COURT:**  Okay.  All right.  Thank you for

17   that clarification.

18        **MR. FALGOWSKI:**  So the Government -- you know,

19   as I was reviewing this, the Government submitted that

20   those five points of trafficking relate to seriousness.

21   And the Government submits that the circumstances of this

22   offense are serious because of the people who wound up

23   with these guns and the use of the guns in actual

24   shootings.  And the Government submits that this is a most

25   serious offense.

1          The Government -- so by putting five points in

2     there, which is what the 23 guidelines have for

3     trafficking, five points, that would take it up to a range

4     with a -- a high-end range of 33 months.

5          And then the Government says 36 because I think

6     that three years is -- frankly, when the Government takes

7     a look at this 12 to 18, I think that -- by half, that

8     underscores or understates the seriousness of this matter.

9     So the Government comes in at 36.  The additional

10    three months -- and this all bleeds together -- the

11    government submits that the defendant, he's got to have at

12    least a 36-month sentence to show some respect for the

13    law.

14         And I go back to when he had his initial bail

15    hearing, he had the audacity to tell this Court's

16    probation that he had a marijuana prescription card, and

17    that he had a prescription for medical marijuana.  There's

18    no basis for that at all.  He just made that up.  To have

19    that mentality to be able to tell this Court's probation

20    officer, after being arrested federally, demonstrates --

21    speaks volumes about what he thinks about this Court.

22         Promotes respect for the law, if the

23    defendant -- the Government submits the defendant is a

24    Hoover Crip gang member.  But if he's not, then at least

25    he shows where his sympathies lie.  He's a no less than a

1    wannabe.  But the Government submits that you don't get a

2    tattoo; you know, you might be Michael Jackson and pose

3    for a photograph, but you don't get a tattoo.

4            And what the police officer also said in

5    response to cross-examination is that the defendant was at

6    a gang meeting.  There was a video of him at a gang

7    meeting.  The Government submits that clearly he is a --

8            **THE COURT:**  Why didn't you show that?

9            **MR. FALGOWSKI:**  Excuse me?

10           **THE COURT:**  Why didn't you show that?

11           **MR. FALGOWSKI:**  Why didn't I show that?

12           **THE COURT:**  Yeah.

13           **MR. FALGOWSKI:**  Well, because the police

14   officer told me that the -- underlying all that is, he

15   didn't want to get into the details of where he got this

16   video because -- because there's a source, and he doesn't

17   want to give that information up.  And so I stayed away

18   from it.

19           **THE COURT:**  I see.

20           **MR. FALGOWSKI:**  But I told Mr. Pugh about it

21   before he --

22           **THE COURT:**  No, no.  Yeah, yeah.  You said you

23   did.

24           **MR. FALGOWSKI:**  -- and he asked the question

25   anyhow.

1              And so -- and that -- what that means, it tells

2       us -- I don't mean to just paint him, you know, with a --

3       paint him as bad because he's a Crip.  But what it does

4       show is that he knows -- he should know what's going on

5       out there.

6              When people -- when there's shootings and guns,

7       I mean, that's just something that a gang member would be

8       attuned to.  He knows -- he should know what's happening

9       on the street.

10             You take people that are going to Delaware

11      State College and they're commuting, they wouldn't

12      necessarily know what's going on.

13             But he's putting 19 guns on the street with the

14      background, with the knowledge, with the understanding of

15      what happens with these guns, what the risk is putting

16      those guns on the street.  And these guns aren't recovered

17      in Illinois.  I mean, they're recovered all in Dover.

18             **THE COURT:**  Well, it was seven that have been

19      recovered.

20             **MR. FALGOWSKI:**  Seven have been recovered in

21      Dover.

22             And the other thing about this is, is that --

23      this isn't like a one act of aberrational conduct.  This

24      isn't like this was a burglary of a gun shop.  This isn't

25      like he committed a theft of 19 guns out of the back of a

1    car.  What he did is, this is a continuing offense over

2    some six months.  And slowly, he straw purchased these

3    guns, one after another.  He had six months to stop, and

4    yet he didn't.  He continued it.

5            And what the guidelines do, the guidelines talk

6    about the number of guns, but they don't talk about the

7    extent of the crime.  The guidelines don't cover that.

8    But that's serious, that this is a continuing crime.  The

9    guns are repeatedly...

10           Dover is a city where -- it's obvious from the

11   way these guns are used and from what the testimony of the

12   officer is, gangs are a problem in Dover.  And people are

13   going to be watching what happens.  And the other gangs

14   members are going to be watching what happens.

15           It would be no secret if you're on social media

16   and you're doing all these hand signals.  You've got a

17   tattoo.  You're in meetings.  You would expect that in

18   Dover that -- that gang members would know one another.

19   You'd have to know that for our own safety.  For your own

20   protection, you'd have to know that, who are gang members.

21   You'd study these photographs and such.

22           And so Dover is a captive audience waiting to

23   find out what's going to happen in this Court to him.

24           **THE COURT:**  The meeting that's videotaped, it's

25   Harmon?  Who's present that -- and I don't know want you

1    to add anything, but just from what the detective

2    testified to.  And I'll ask Mr. Pugh the same question.

3             So the testimony that was adduced on

4    cross-examination is that it's -- Harmon is present at a

5    gang meeting.  This is a Crips gang meeting, correct?

6             **MR. FALGOWSKI:**  Yes.

7             **THE COURT:**  And it's Harmon, the defendant.

8             Was anybody's other name mentioned?

9             **MR. FALGOWSKI:**  Dixon.  My recollection is that

10   he said --

11            **THE COURT:**  It was the three of them, right?

12            **MR. FALGOWSKI:**  -- "so you've never seen the

13   two of them together?"  Something along those lines.

14            **THE COURT:**  And that is my recollection.

15            But, Mr. Pugh, do you disagree with this?

16            **MR. PUGH:**  Your Honor, the Court did say "the

17   three of them."  It would just -- the officer testified

18   that my client and Mr. Dixon were from at a meeting that

19   he classified as a gang meeting.

20            **THE COURT:**  I thought -- and he didn't say with

21   Harmon?  I thought he said with Harmon.

22            **MR. PUGH:**  Mr. --

23            **THE COURT:**  Sorry.  Sorry.  I thought there was

24   a third individual --

25            **MR. PUGH:**  No, Your Honor.

1          THE COURT:  -- and that's my bad.

2          So was there a third individual?

3          MR. FALGOWSKI:  I don't recall a third

4     individual.

5          THE COURT:  So it's just Dixon?

6          MR. PUGH:  Correct, Your Honor.

7          THE COURT:  Yeah.  Again, that is -- I don't

8     know why, but I do use "Harmon" and "Dixon"

9     interchangeably.  I don't mean you any disrespect, Mr. --

10          THE DEFENDANT:  You're fine.

11          THE COURT:  -- Mr. Harmon, about that.

12          Okay.  But the bottom line is that meeting --

13     now, do we also have -- and, again, I don't want you to

14     add the testimony.

15          Mr. Pugh, I'll ask you first.  Was there a date

16     of that meeting?

17          MR. PUGH:  Your Honor, he did not give a date.

18          THE COURT:  Okay.  Do you disagree with that?

19          MR. FALGOWSKI:  He did not give a date.

20          THE COURT:  Okay.

21          MR. FALGOWSKI:  Thank you.

22          And then, the Government also believes that one

23     of the factors mitigating toward a significant sentence is

24     the characteristics of the defendant.

25          We have many defendants that come before this

1    Court and they're similarly situated to the defendant,

2    except that they've grown up, basically, neglected and

3    abused.  They didn't have much of an opportunity.  They

4    didn't have a social anchor.

5              The defendant, on the other hand, his mother

6    and his father, from what's reported in the presentence

7    report, gave him all the nurturing that they could.  He

8    went to a charter school in Dover.  They were driving him

9    there, to the charter school, so that he would have

10   advantage of that.

11             And then he went to Poly Tech.  By the way, he

12   told the probation department he graduated.  Mother

13   corrected that.  He was an 11th grade dropout.  He wanted

14   to be an architect.  He was studying some sort of design.

15   He was on a basketball team.

16             So he would have had -- he would have had what

17   one could expect would be teachers and coaches, mentors.

18   He has letters of recommendation from a grandfather, from

19   a pastor.  And he had that available to him, and he

20   squander all of that and turned to the Crips.

21             And the defense argues, said, Well, he was only

22   21 when his father died.  He was only, like, 22 when he

23   was arrested.  But that is -- that's significant, that he

24   was 21 when his father died.

25             The people that were in that Whatcoat

1    apartment, there were four people in the apartment.  Three

2    of them were charged with shootings.  Four of them were

3    juveniles; one was 23, the other three were 17, and one

4    was 16.

5         And so when you have a 16-year-old, 17-year-old

6    juvenile that can't possess guns in the first place and

7    someone else is 21, that's a wide spread in years.  It's

8    not a mitigating circumstance.  The defendant was only 21

9    when he began committing these offenses, that he lost his

10   father at the age of 21.

11        And so he's not the person that one -- you

12   know, your heart has to go out for them because, oh, my

13   God, they were neglected, abused.  They had no social

14   anchor.  They -- you could expect that they would have --

15   you could understand that they turned criminal.  Not this

16   defendant.  He had an option.  And, that, I think,

17   mitigates against him.

18        So that's the Government's recommendation, a

19   variance of 36 months.  Part of that is the five -- you

20   know, the trafficking and the rest of it is those other

21   things.  The Government believes that 36 is the -- would

22   be, you know, the absolutely minimum that the Court should

23   consider.

24             **THE COURT:**  All right.  Thank you.

25             Mr. Pugh.

1          **MR. PUGH:**  Thank you, Your Honor.

2          Your Honor, we first refer to our sentencing

3     memo to address the Government's request for a variance.

4          First, Your Honor, as we indicated in our

5     asking memo, the criteria for a variance is laid out in

6     the case law and that the presumption is that that will

7     only occur in situations where the conduct is not

8     accounted for within the sentencing guidelines.

9          **THE COURT:**  And how is the fact that seven of

10    these guns are recovered, they are recovered in the hands

11    of either convicted felons or perpetrators of other

12    criminal activity?  How is that accounted for in the

13    guidelines?

14         **MR. PUGH:**  Your Honor, the Third Circuit Court

15    of Appeals in the *United States v Bass* stated that 2K2.1

16    contemplates that transferred guns would end up used in

17    future crimes.

18         So while I understand the Court's question, but

19    the Third Circuit says that is examined already by the

20    guidelines.

21         **THE COURT:**  Do you want to show me where in

22    2K2.1 it's contemplated?

23         **MR. PUGH:**  Your Honor, if the Court is looking

24    for me to find a specific line in there that says that,

25    Your Honor, I can't point to it.  I'm only referring to

1    the decision out of the Third Circuit, and the words they

2    used to refer to it in a case in which individuals were

3    shipping guns, I believe, overseas.  And the issue came up

4    about the use of those guns.

5              **THE COURT:**  All right.

6              **MR. PUGH:**  Your Honor, even if the Court would

7    consider a variance in this case based off of that,

8    Your Honor -- based off of the Government's argument, Your

9    Honor, we would argue that it's inapplicable.  Your Honor,

10   the Government here argues for a five-point variance, and

11   then some on top of that based off of the fact that the

12   guidelines have changed.

13             Now, as the Court is well aware, the reason we

14   objected to that inclusion -- or the Court may not be

15   aware that originally probation had examined that.  And we

16   said, Well, that's not appropriate in this case because

17   the guidelines have changed, and we can't utilize that

18   given that it wasn't in existence at the time the offense

19   occurred.

20             What I would point out, Your Honor, that the

21   traffic enhancement that the Government references is two

22   parts.  There's a two-point enhancement under A, and then

23   a five-point enhancement under B.  The two-point

24   enhancement is automatic, but the five-point enhancement

25   requires other factors to be found by the Court for the

 1    enhancement to apply.  So even --

 2              THE COURT:  Just for the record, what specific

 3    provision are you referring to?

 4              MR. PUGH:  Your Honor, the Government was

 5    arguing with respect to 2K2.1.  I believe it is (b)(6).

 6    And I apologize, Your Honor.  I can tell the Court in a

 7    second.

 8              Court's indulgence.

 9              2k2.1(b)(5)(C).  Pardon me, Your Honor.

10              THE COURT:  All right.

11              MR. PUGH:  Your Honor, so even if the Court

12    were to consider it under the grounds the Government is

13    arguing, there would be other findings of fact that would

14    need to have been made in order to justify a variance

15    based off of the logic they're implying to go all the way

16    up to a five-point level.  As I said, the automatic

17    enhancement is only a two-point.

18              And, Your Honor, based off of the guidelines

19    that requires a conviction under the trafficking statute,

20    which we've recognized wasn't in existence -- but that

21    appears to be the logic that the Government is employing

22    here, that he should be sentenced as if he was

23    trafficking, and then the enhancement applied that would

24    be appropriate in that circumstance.  But that would be a

25    lesser enhancement.

1          **THE COURT:**  All right.

2          **MR. PUGH:**  Your Honor, the Government argues

3     that it should be applied given the use of the guns that

4     occurred, and because, as they put forward, they believe

5     that my client is a member of a gang organization.

6          What they haven't demonstrated, Your Honor, is

7     any connection between the individuals who used that gun,

8     those -- the guns that were used or even found with, Your

9     Honor, and my client; nor have they indicated any

10    connection between those individuals who were found with a

11    gun or used a gun, and any gang membership.

12         There was no evidence that said any of those

13    individuals who used the gun or found the gun belonged to

14    a gang.  In fact, there's no evidence that the incident

15    involved gang activity or gang membership.

16         One of the incidences that the Government

17    points to is the vehicle that was shot.  And they

18    mentioned the individual who was driving that car in their

19    sentencing memo, a woman that they indicate.  But they

20    don't indicate that she was involved in gangs or gang

21    activity, or associated in way.  They mention the young --

22    the five individuals who were found in the apartment where

23    the gun was located.  They don't indicate those people

24    were involved in gangs.  The incident -- well, any of the

25    other individuals who were arrested.

1           All -- and, Your Honor, some of these

2     individuals were convicted.  So they were investigated.

3     They were prosecuted.  They were convicted.  And there's

4     no evidence that any of them were in a gang, or had an

5     association with a gang, or were involved in gang

6     activity.  There's none of that.

7           So, Your Honor, well, we're by no means

8     conceding that Mr. Harmon was involved in a gang.  But

9     even if he was alleged to, there's no connection between

10    any of that.

11          Your Honor, furthermore, as the Court may very

12    well be aware, the mere fact that he was -- even if the

13    Court had found that he was involved in a gang, and the

14    Court hasn't indicated that, mere membership in an

15    organization that advocates illegally activity isn't

16    enough to demonstrate that there's any other activity that

17    he's condoning or supporting.

18          So, for instance, Your Honor, they're simply

19    trying to say that because he's a member of a gang, that

20    the Court should take that into account, and that the

21    Court needs to sentence him accordingly.  But, Your Honor,

22    that's not probative of his particular values, beliefs or

23    actions.

24          In fact, Your Honor, in the United States

25    Supreme Court case, *United States versus Abel*, the Court

1    referenced the fact that mere membership without more has

2    no probative value in relating to an individual's criminal

3    conduct without indication of their own actions, their own

4    beliefs, or their own support of those things.

5             So they may say he's a member, but they haven't

6    indicated that any of his activity is related to that

7    membership, nor have they indicated that any of the events

8    surrounding the acquisition of these guns -- by

9    "acquisition," I mean the recovery by law enforcement --

10   or the use of those guns was related to gang activity.

11   They make that assertion in saying classic gang activity,

12   but they support that with no factual findings.  And there

13   was clearly plenty of opportunity to do that, both in the

14   investigation itself and quite, Your Honor -- quite

15   honestly, Your Honor, in when we had the testimony from

16   law enforcement, they didn't say anything about that

17   related to this.  And that was the individual who was

18   involved in this case and the cases involving the other

19   individuals.

20            So, Your Honor, they're stretching for an

21   enhancement based off of a trafficking enhancement that

22   doesn't apply, that they haven't found the evidence to put

23   forth the Court for it to apply, at least not to the level

24   of a five-point adjustment; nor have they connected any of

25   these things to actual gang activity to support the fact

1    that my client should be enhanced in the sentence because

2    they're alleging that he's in a gang.

3              And, Your Honor, they are making allegations

4    about the lack of candor of my client when he was

5    initially interviewed by probation.  And, Your Honor, we

6    acknowledge that sometimes that happens.  But we're not

7    talking about statements related to activities related to

8    specifically the case.  We're talking about a young person

9    who used marijuana and was scared to admit it.  And that

10   would account for it.  There's no more nefarious element

11   related to that, Your Honor.  It's not indication of a

12   disrespect for the Court or some indication that he has no

13   appreciation for the law.

14             Your Honor, the Government argues that he needs

15   a strong sentence because this case is being heavily

16   watched and followed by gang members.  Again, without

17   offering any proof to back that up, that anyone is

18   following this.  There certainly isn't media coverage.  No

19   one is posting online as far as the Government is aware

20   because they haven't presented anything.  There is no

21   indication that this case sentencing would reverberate any

22   more than any of the thousands of cases that happen across

23   the country that nobody knows about.

24             Your Honor, it's -- as the Court is well aware,

25   the biggest factor in prohibiting future activity of the

1    public in general is the certainty that prosecution will

2    occur as a result of an arrest.  It is not the length of

3    the sentence, largely, Your Honor, for the reasons of the

4    fact that people don't contemplate how long they're going

5    to go to jail when they commit a crime.

6            To some extent, people do contemplate whether

7    they're going to get caught or not.  And so with respect

8    to the deterrence factor, the biggest element of that has

9    occurred because Mr. Harmon has been arrested and he's

10   being prosecuted.

11           And as far as the community would go, that

12   would be the end of it.  Somebody did wrong, they got

13   caught, and they got prosecuted.

14           **THE COURT:**  All right.

15           **MR. PUGH:**  Your Honor, I would also add, very

16   quickly, that I think it is very significant that

17   Mr. Harmon's age -- now, again, as we said in our memo, we

18   are not trying to excuse his behavior.  But the Supreme

19   Court in multiple cases, as we noted in your sentencing

20   memo, has recognized the poor decision-making, impulsive

21   behavior, and lack of consequential thinking that occurs

22   in young people, even young adults.  And that the

23   processes that allow for a more appropriate level of

24   executive function in the brain don't occur until the

25   mid-to-late 20s.  The Courts have recognized that.  The

1    Supreme Court has recognized that.

2    And, again, Your Honor, we're not excusing his

3    behavior, but we do think that's pertinent particularly in

4    fact that all these behaviors that we're talking about

5    here, that the Government is alleging, began shortly after

6    my client's father died. And I think that is relevant to

7    the fact of a person who was struggling to find himself,

8    but certainly wasn't going out and engaging in conduct

9    anything like this, went south after that occurred.

10   And, again, Your Honor, that's not an excuse,

11   but it is relevant in the Court's consideration of the

12   fact that an individual, who is alleged to be a gang

13   member, for 21 years amasses a criminal history serious

14   enough to be a level 1. That's it. Because his conduct

15   just, was that -- that 1 would relate to a young person

16   who clearly is just trying to find themselves and is not

17   making the best decisions and using marijuana and

18   posting --

19   **THE COURT:** Well, I mean, you know, in the

20   presentence report, I mean, he doesn't report daily use of

21   marijuana, and he says it had no affect on him. He

22   literally says that.

23   **MR. PUGH:** But, Your Honor, I'm not alleging

24   that the marijuana led to this. I was merely pointing out

25   the fact, Your Honor, that that's why he said he had a

1    marijuana card, not because he had no respect for the

2    Court.

3            I'm certainly not alleging the marijuana led to

4    this conduct, Your Honor.  And I apologize if I gave the

5    Court that impression.

6          **THE COURT:**  You don't have to apologize.  I

7    just want to make sure.

8            All right.  And then, let me just clarify.  Are

9    you disputing that the phone calls show that Dixon,

10    Coleman, and your client had an understanding that your

11    client was going to buy guns and were going to end up in

12    Coleman's possession?

13          **MR. PUGH:**  Absolutely, Your Honor.  There is no

14    evidence that there's --

15          **THE COURT:**  You dispute that?

16          **MR. PUGH:**  Yes.  Yes.

17            And, Your Honor, lastly, I just want to say

18    very quickly, the Government is alleging in this case for

19    a five-point variance.  I'm sure, as the Court is very

20    familiar, the Court had before it, less than a year ago, a

21    very similar case involving the *United States versus*

22    *Freeman.*  And in that case, there was alleged gun

23    trafficking, similar.  There was a much larger number of

24    guns in that case.  We were in the category, the 25 to

25    100, in that one.

1          And, Your Honor, in that case, there were other

2    factors involved, but the Government was prepared to offer

3    argument with respect to a variance in that case because

4    of the large number of guns.  And in that case, they were

5    only asking for a variance of four levels.  The Court

6    ultimately didn't do that because the Court found, based

7    off of an enhancement, that -- a similar sentence level.

8          But, Your Honor, what I'm pointing out here is,

9    with a much smaller number of guns, the Government is

10   asking for a greater enhancement, and even hasn't met the

11   criteria for that based off of the guidelines that weren't

12   even in existence at the time that my client committed the

13   offenses.

14         For these reasons, Your Honor, we would ask

15   that the Court sentence him to a guideline sentence.

16         **THE COURT:**  All right.  Give me a second.

17         Mr. Falgowski, do you want to say anything?

18         **MR. FALGOWSKI:**  Excuse me, Your Honor?

19         **THE COURT:**  Go ahead.

20         **MR. FALGOWSKI:**  First, that case, *Bass*.

21   Counsel argued *Bass.  Bass* is from 1995.  That case was

22   1995, when the guidelines were mandatory, it was not a

23   variance case.  It was a departure case, and it was ruled

24   simply on departure.  It has no applicability to this case

25   because this is departure.

1          In *Freeman*, my rec- -- and I've read that case.

2    *Freeman* was about 30 guns.  It was the interstate

3    transportation on 95 that got that started.  But only

4    about three of those guns were recovered, and no one was

5    charged with the possession of any of those guns.  One was

6    found on the street, one was found in a car with multiple

7    occupants.  They didn't charge anybody.  And the other

8    gun, a third gun, was recovered, but I don't recall the

9    circumstances.  But there were no arrests in *Freeman*

10   regarding any of those guns that were recovered.

11          In *Freeman*, some of those guns were -- they

12   were stolen.  And so there was additional points there.

13   Because it was 30 guns, there was an additional adjustment

14   in the offense level.  But the circumstances of the

15   recovery of those guns in *Freeman* was not as serious as is

16   this case.

17          The hallmark, the decision is -- comes down to

18   basic understanding of the seriousness of the offense.

19   And 12 to 18 just doesn't do it.

20          **THE COURT:**  And what about Coleman?

21          **MR. FALGOWSKI:**  Coleman?

22          **THE COURT:**  Well, you know, you read this

23   transcript of July 2020, aren't they arranging for Coleman

24   to end up with the gun?

25          **MR. FALGOWSKI:**  Yeah, yeah.  See, but Coleman's

1    dealing with Dixon.

2              **THE COURT:**  I know he is.  But my point is

3    that's -- in other words, it's an inference.  But

4    Coleman's dealing with Dixon, talking about getting the

5    gun.  And within how many hours --

6              **MR. FALGOWSKI:**  Right.

7              **THE COURT:**  -- we have a gun purchased by the

8    defendant for Dixon?

9              **MR. FALGOWSKI:**  Yeah.  And what --

10             **THE COURT:**  So why shouldn't I draw the

11   inference that the plan here was to get Coleman a gun?

12   And then Coleman ends up with a gun; isn't that --

13   purchased by the defendant, correct?

14             **MR. FALGOWSKI:**  Coleman.  Yeah, he's got the

15   gun --

16             **THE COURT:**  Correct.

17             **MR. FALGOWSKI:**  -- at the Capital Inn --

18             **THE COURT:**  Right.

19             **MR. FALGOWSKI:**  -- because they were taking

20   down that wiretap investigation.  And they went in, that's

21   when they recovered the gun.

22             And the defendant, you would -- in his

23   post-arrest statement, the defendant said, "I never got

24   paid.  I never got paid."  He admitted that he gave the

25   gun to Dixon.  But he said, "I never got paid.  I never

1    got paid.  I never got money for that."

2         But it's clear from that transcript that he's

3    going to get his off the top.  That's what Dixon said.

4    He's going to get it off the top.

5         **THE COURT:**  Correct.

6         **MR. FALGOWSKI:**  And he told the agent -- he

7    told the detective at his post-arrest statement, "I never

8    got any money."  So the inference would be that he would

9    go back to Dixon and say, Where is my money?  Where is my

10   money?

11        And Dixon would say, Well, I can't get it from

12   Coleman because he got arrested.  And the defendant would

13   say, Oh, my goodness, Coleman had my gun?

14        And then what did he do?  He went out and he

15   bought seven more guns after that, and put seven more guns

16   on the street.

17        And so the inference would be that if he didn't

18   know ahead of time, if he didn't know that this gun was

19   going to Coleman, he would have learned that necessarily

20   because he wants his money and he wants an explanation

21   from Dixon -- Why didn't I get my money?  And yet he

22   continued to put the guns out there.

23        **THE COURT:**  Okay.

24        **MR. FALGOWSKI:**  I think I covered the rest of

25   the defendants.

1      THE COURT:  What about the five versus the

2  two-point enhancement argument?

3      MR. FALGOWSKI:  Well, there is a -- five

4  points.  The guidelines, in the '23 guidelines, in

5  Section 5, 2K2.15 --

6      THE COURT:  Yeah.

7      MR. FALGOWSKI:  -- it's sub-caption (a), (b),

8  and (c).  And (c) says if two or more firearms -- if two

9  or more firearms were transferred, and the defendant had

10  reason to believe that either the persons are prohibited,

11  they're going to be used, then that is a five-point

12  increase.

13      THE COURT:  Right.  But it's "knowing or having

14  reason to believe that the conduct would result in the

15  receipt of the firearms by, one, individual had a prior

16  conviction for a crime of violence, controlled substance

17  offense, or misdemeanor, or crime of domestic violence."

18      So what do we have there?

19      MR. FALGOWSKI:  Are you talking about (c),

20  Your Honor?

21      THE COURT:  Yes.

22      MR. FALGOWSKI:  Right.  And these are -- a

23  crime of violence is going to be determined under the

24  guidelines.  And the case law shows, well, what is crime

25  of violence?  And --

1          THE COURT:  Yeah, but what I'm saying is that

2    it's the "knowing or having reason to believe" I want you

3    to focus on.

4          MR. FALGOWSKI:  Yeah.

5          THE COURT:  Right.  Because even Coleman --

6    your position is he absolutely has to know after Coleman

7    is apprehended, that -- what's going on with his guns.

8          MR. FALGOWSKI:  After the affect, yes.

9          THE COURT:  Has to.

10          MR. FALGOWSKI:  Yeah.

11          THE COURT:  But we don't have any evidence.  I

12    mean, we have Dixon and Coleman in the Title III --

13          MR. FALGOWSKI:  Yes.

14          THE COURT:  -- right?

15          MR. FALGOWSKI:  Yes.

16          THE COURT:  And then it's that, coupled with

17    the defendant's purchase for Dixon of the gun, is what

18    ultimately gets back to Coleman.

19          MR. FALGOWSKI:  Yes.

20          THE COURT:  Right?

21          MR. FALGOWSKI:  Yes.

22          THE COURT:  Okay.  And Dixon is not a person

23    prohibited.

24          MR. FALGOWSKI:  Not at that time.

25          THE COURT:  Right.

1          Okay.  So then take me through, how do we get

2     two or more guns that the defendant knows or has a reason

3     to know will end up being possessed by a person

4     prohibited.

5          **MR. FALGOWSKI:**  My point is, we don't.  We

6     don't know -- we don't have that.  We're missing that.

7     We're so close.  So close.

8          **THE COURT:**  Right.  Okay.  But you want me to

9     apply the five-point; essentially, give him the five

10    points.

11         **MR. FALGOWSKI:**  Because of the seriousness of

12    the offense.  The guidelines kind of let us down.  The

13    guidelines --

14         **THE COURT:**  They have a gap.

15         **MR. FALGOWSKI:**  They do.  They have this gap.

16    And it's the seriousness.  One would take a look at that

17    five points and say, Well, that's serious conduct.

18         **THE COURT:**  Right.

19         **MR. FALGOWSKI:**  And what we have here, is we

20    have serious conduct.  And, although that serious conduct

21    doesn't meet the guidelines, it makes it no less serious.

22         **THE COURT:**  Right.

23         **MR. FALGOWSKI:**  And so the guidelines is just a

24    starting point.  And if the Court finds that this is

25    serious conduct, and the guidelines is a good starting

1        point; but the actual underlying conduct, the defendant's

2        characteristics, the deterrents value, that all of that,

3        if it's serious, then we don't have to match up against

4        the guidelines.

5             The defense's argument in *Bass*, that's what

6        they were saying.  You know, you've got to just because

7        you don't meet the guidelines, and so there's no reason.

8        Forget about the guidelines, essentially.  The guidelines

9        start; they get us the 12 to 18.

10            Now, does that -- is that sufficient, but not

11       necessary to deal with, the seriousness of the offense?

12       And the Government says it's not by double.

13            **THE COURT:**  Right.  Okay.

14            All right.  Thank you.

15            **MR. PUGH:**  May I just correct the record very

16       quickly, Your Honor?

17            **THE COURT:**  Okay.

18            **MR. PUGH:**  With respect to *Freeman*, it was more

19       than 50 guns.  The Court may actually recall that.  The

20       Government was alleging more, but they provided pictures

21       of 50-plus guns.  And --

22            **THE COURT:**  What did Freeman get?

23            **MR. PUGH:**  Your Honor, it was 54 because he

24       also had the obstruction of justice and, Your Honor, the

25       number of guns, and the traffic enhancement.  So that's

1    how he ended up at that sentence.

2            **THE COURT:**  Okay.

3            **MR. PUGH:**  Your Honor, and then with respect to

4    our argument, Your Honor, as we pointed out in our memo,

5    the Courts have said that the evaluation for departures

6    and variances is based off of the same understanding, and

7    we reference that in the case within our standing memo.

8            **THE COURT:**  Okay.  All right.

9            All right.  Is there anything else you need to

10   say about sentencing?

11           **MR. FALGOWSKI:**  No, Your Honor.

12           **THE COURT:**  Do you need to say anything else?

13           **MR. PUGH:**  Nothing additional than what we've

14   said, Your Honor.

15           **THE COURT:**  Okay.  And does Mr. Harmon want to

16   say anything?

17           **MR. PUGH:**  Your Honor, he would, just very

18   briefly, like to make a very short statement.

19           **THE DEFENDANT:**  I would just like to -- on

20   behalf of myself to the Court, I would just like to

21   apologize for my behavior, just -- period -- throughout

22   this whole situation, starting from the arrest up until

23   now, coming into sentencing.

24           I also want to apologize to may mother because

25   she never -- just, she expects better from me.  And I know

1    I will do better for her next time.  I'm asking for a

2    second chance.

3              **THE COURT:**  Why did you put those guns on the

4    street?

5              **MR. PUGH:**  Your Honor, my client wouldn't make

6    any additional statement than what he's already shared.

7              **THE COURT:**  All right.

8              All right.  I'm going to grant the variance

9    motion, and I'm going to actually sentence the defendant

10   to 36 months for a number of reasons.

11             So for starters, I don't think the guidelines

12   capture the seriousness of this offense.  They don't

13   capture it in two ways.  The first is the number of

14   firearms.

15             So the guidelines have an enhancement for the

16   number of firearms, but it applies to all the different

17   gun crimes.  And then they have the trafficking subsection

18   that we've been discussing, the two and five level

19   increases.

20             But what that enhancement, even coupled with

21   the number of firearms, fails to capture is the type of

22   case we have before us where somebody is, at the very

23   least, recklessly putting guns in a dangerous community,

24   knowing that the audience with whom he is speaking about

25   the offense are gang members, or at the very least, people

who want to emulate known dangerous gangs, namely the
Crips.

          And the guidelines do not reflect the
seriousness of that behavior, which we know in this case,
at the very least, resulted in guns being seized in
connection with nine -- with seven, rather, crimes,
including shootings.  We know that because of the tracing.

          And violence is plaguing this country.
Violence is ruining Dover.  It's ruined Dover.  Dover is
no longer a safe place to go out and walk.  It's a small
city.  It's a tragedy.  Anybody who's been to Dover knows
what a tragedy it is, this beautiful architectural city
that you cannot walk the streets of.

          And unlike a lot of the defendants I see before
me, this defendant had opportunities presented to him.  He
had successful parents, good parents who valued education,
who made sure he got to go to a charter school.  He didn't
have a criminal history, you're right, Mr. Pugh.

          Now, Congress has said that I'm supposed to
impose a sentence that is sufficient but not greater than
necessary to accomplish the purposes of sentencing.

          Now, one of those purposes is uniformity.  It's
to make sure people are treated the same, and I try to do
that.  And I typically defer to the guidelines precisely
because of that.

1          But in this case -- and I've commented in other

2     cases -- as I've already said, I don't think the

3     guidelines actually fairly captures this type of offense

4     where somebody is knowingly putting on the street weapons

5     and has good reason to know that those weapons are ending

6     up in the hands of felons, and certainly, in this case, to

7     know they're in the hands of dangerous people who want to

8     be associated with the Crips, if they're not associated

9     with the Crips.  Neither is a good thing.

10          Uniformity, I don't think, is served in this

11     case by just blindly adhering to the guideline range of 12

12     to 18 months.

13          Another purpose of sentencing is to reflect the

14     seriousness of the offense.  And as I've said, and the

15     reason why I'm going to vary, is because this is a really

16     serious offense.  As I've said, you cannot walk the

17     streets of Dover because of gun violence and feel safe.

18     Because of gang activity and gun violence, you cannot feel

19     safe any longer.

20          And, Mr. Pugh, I don't know what attention in

21     the media this case has gotten, but attention needs to be

22     gotten.  And that leads me to the second purpose of

23     sentencing, which is deterrence.  And there's two types of

24     deterrence.

25          Mr. Harmon, there's two types of deterrence.

1    Do you know what deterrence means?

2                **THE DEFENDANT:**  No, sir.

3                **THE COURT:**  Deterrence means -- deter means to

4    stop, to prevent, to send a message.  And there's two

5    types in the law.  One is specific deterrence.  And it's

6    to address it to you personally.

7                And what's unusual about you is you don't have

8    a criminal history.  And that would say, hopefully, you're

9    right, that this is -- you're going to turn around, which

10   you said to your mother.  And normally, in most cases, I

11   should say, when I send a message of deterrence, it is

12   largely addressed to the individual defendant.  And it is

13   to you, partly.  It's to say, Yeah, you've got to stop.

14   You can't to do this anymore.  You should stop associating

15   with Crips or people who want to be Crips.  Those are not

16   good people.

17               But the second type of deterrence is what we

18   call general deterrence, and it's to send a message to the

19   public.  And that is a big part of what I'm doing here.

20   Because I have to send a message to the young folks in

21   Dover, who are like you, to say, Do not help these Crips

22   get guns.  Do not put guns on the street.  Do not take

23   advantage of the fact that you have not been convicted of

24   a crime to go buy weapons only to put them on the street.

25   It's just not right.

1          Your mother cannot walk the streets of Dover

2     and feel absolutely safe.  She's got to worry about the

3     potential for gun violence.  And that's not fair.  We

4     can't live in a society where law-abiding citizens, like

5     your mother, cannot feel safe on the street.

6          So there has to be a message sent to the public

7     at large, Stop this gun -- it is essentially gun

8     trafficking, what you did.  That's essentially what it

9     was.  And you put 19 guns on the street.  And we don't

10    know where 12 of them are, but we know seven of them ended

11    up in crimes, and mostly in the hands of people

12    prohibited.  So that's why I have to send a message of

13    36 months.  It's three years.

14          That's a number people will get.  People will

15    understand that number, that even if I don't have a

16    criminal record, if I go to a gun store and I buy a gun,

17    and I lie to get that gun because I'm not going to possess

18    it; I'm going to put it on the street, there are serious,

19    serious consequences that follow from that.

20          Now, your personal characteristics.  Look, you

21    seem -- when you're in here, you're polite, you're

22    respectful.  You're clearly smart.  There's hope for you.

23    But at the end of the day, when I weigh those good

24    characteristics and I look at what you did -- and I

25    sentence people for mainly what they have done -- it tells

1    me, in the totality, that 36 months is the right sentence.

2    That's the sentence that I think is appropriate when I

3    weigh all the different characteristics and

4    considerations, I should say, that I'm supposed to weigh.

5    I think that sentence is necessary to accomplish all those

6    purposes of sentencing.

7            I hope you will take this message seriously,

8    that you will, when you get out, contribute.  You

9    certainly have the characteristics to be able to

10   contribute to our society in very important ways.  So I

11   hope you'll do that.  I hope we don't have to ever see you

12   in the system again.

13           Unlike a lot of people that come before me,

14   because of your mother and because what I see as your

15   obvious intelligence, I think you could contribute to the

16   good of Dover, all right, and the community at large, and

17   I hope you will do that.

18           This is the sentence I intend to impose:

19   Pursuant to the Sentencing Reform Act of 1984, it's the

20   judgment of the Court that the defendant, Jordan Donyell

21   Harmon, is hereby committed to the custody of the Bureau

22   of Prisons to be imprisoned for a period of 36 months.

23   The Court has considered all the factors set forth under

24   18 U.S.C., Section 3553(a), and finds this sentence to be

25   reasonable and appropriate.

1          Upon release from imprisonment, you shall be

2     placed on supervised release for a term of one year.

3     Within 72 hours of release from the custody of the Bureau

4     of Prisons, you shall report in person to the probation

5     office in the district to which you are released.  While

6     on supervised release, you shall not commit another

7     federal, state, or local crime, you shall comply with the

8     standard conditions that have been adopted by this Court,

9     and you shall comply with the mandatory and special

10    conditions listed in Paragraph 119 of the Presentence

11    Report.

12          It is further ordered that you shall pay to the

13    United States a special assessment of $100, which will be

14    due immediately.  The Court finds that you do not have the

15    ability to pay a fine.  The Court will waive the fine in

16    this case.

17          There's one other thing I did not say, and I

18    meant to, when I talked about the totality of the

19    circumstances I had weighed, and it's this:  I also don't

20    think there's been remorse here.  It's one thing to say

21    you regret the situation, you regret what you've done to

22    your family, but I don't think, Mr. Harmon, you've taken

23    full stock of the harm that your conduct has caused, and

24    probably is going to cause because we don't know what,

25    yet, what happened to those other 12 guns.

1          And so when you put a tattoo -- and I doubt, to

2     be candid, I don't believe that that tattoo is there for

3     any reason other than your affinity for what the Crips

4     stand for.  And when I look at the pictures and the social

5     media of you using those known gang signs, and the fact

6     that you've not stood up here and said that you regret

7     putting these guns on the street, and putting those guns

8     in the hands of people who, as I say, are either in the

9     Crips or want to be, that's another reason I feel like I

10    have to give you the 36 months.  It's that lack of

11    remorse, full acceptance of responsibility.

12         And you had an opportunity when you were

13    arrested to help the police trace some of those guns and

14    maybe get them off the streets, but you did not take full

15    advantage of that opportunity.  So I meant to include that

16    in my discussion of the sentence.

17         Now, I've read the sentence.  Are there any

18    objections other than what have been stated previously to

19    be announced sentence?

20         Mr. Falgowski?

21         **MR. FALGOWSKI:**  No, Your Honor.

22         **THE COURT:**  Mr. Pugh?

23         **MR. PUGH:**  No.  We stand on our previous

24    arguments, Your Honor.

25         **THE COURT:**  All right.  Then, it is the order

1    of the Court that the sentence be imposed as stated.  The

2    clerk's office shall prepare the judgment.  My deputy

3    clerk shall enter judgment of conviction.

4              I don't know if there's an appellate waiver in

5    the plea agreement.  Was there?

6              **MR. FALGOWSKI:**  I don't believe there was,

7    Your Honor.

8              **MR. PUGH:**  There was not, Your Honor.

9              **THE COURT:**  All right.

10             Then, Mr. Harmon, you have the right to appeal

11   within 14 days after the entry of the judgment of

12   conviction, and you should discuss that right to appeal

13   with Mr. Pugh.

14             If you cannot afford the cost of an appeal, you

15   may file a request for permission to file that appeal

16   without paying those costs.  All right.

17             Any other matters?

18             **MR. FALGOWSKI:**  No, Your Honor.

19             **MR. PUGH:**  No, Your Honor.

20             **THE COURT:**  All right.  We're adjourned.  Good

21   luck.

22             (The proceedings concluded at 4:59 p.m.)

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3          I hereby certify that the foregoing is a true and

4    accurate transcript from my stenographic notes in the

5    proceeding.

6

7                                    /s/ Bonnie R. Archer
                                     Bonnie R. Archer
8                                    Official Court Reporter
                                     U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25